MARKO DUROVIC, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1633-65.     Filed December 3, 1975.

---

*Anna R. Lavin,* for the petitioner.
*Rex A. Guest,* for the respondent.

SUPPLEMENTAL OPINION

IRWIN, *Judge:* In an opinion filed June 24, 1970 (54 T.C. 1364 (1970)), this Court made certain findings with respect to three items which entered into the computation of the costs of goods sold with respect to the production of 200,000 ampules of the drug Krebiozen by Duga Illinois, a partnership in which petitioner held a 50-percent interest.

First, we determined that the raw material cost incurred in Argentina on January 26, 1950, of the 2 grams, 35 centigrams of powder which was used to produce the 200,000 ampules of Krebiozen in the United States was M$N 3,005,000 [1] (Argentine pesos). We further determined that the U.S. dollar equivalent of that amount should be calculated at the rate of 9.66 pesos to 1 U.S. dollar. This was based on a stipulation of the parties of a table which professed to set forth the "official" and "commercial" rates of exchange. We adopted the "commercial" rate of exchange.

Second, the partnership incurred expenses of $105,387.28 relating to research and the sterilization, ampuling, and packaging of the drug, which was recorded in an expense journal stipulated to by the parties. Employing the *Cohan* rule (*Cohan v. Commissioner,* 39 F. 2d 540 (2d Cir. 1930)), we allocated one-half of this amount to the cost of goods sold. We held the other half to be nondeductible capital expenditures (research and experimental costs).

Third, we found that although 63,903 of the 200,000 ampules of Krebiozen were distributed without charge to the medical

---

[1] M$N is the sign for "moneda nacional" or paper currency.

profession in years prior to the years before the Court, the cost of goods sold should be spread over the total 200,000 ampules produced. The effect of this was to deny any allowance as a part of the cost of goods sold for the 63,903 ampules distributed without charge.

Petitioner appealed from our decision to the Court of Appeals for the Seventh Circuit claiming, inter alia, that we erred in disallowing one-half of the $105,387.38 amount and in spreading the costs over 200,000 ampules rather than over 136,097 ampules. He further claimed we erred in applying the "commercial" rate of exchange of 9.66 pesos to the dollar rather than the rate of 3.36 which he urged. With respect to this latter contention, petitioner submitted that the "basic buying rate" as set forth in the Federal Reserve Bulletin should be employed. As evidence of this rate was not presented to this Court, petitioner requested the Court of Appeals to take judicial notice of this Government publication.

The Court of Appeals (*Durovic v. Commissioner,* 487 F. 2d 36 (7th Cir. 1973)) held that we erred in not allowing the full $105,387.38 to be employed in determining the cost of goods sold. That court agreed with us that the cost of producing the ampules should be spread over the 200,000 ampules actually produced. However, it remanded the case "to permit the Tax Court to determine whether the taxpayer is to get a deduction for the cost of the 63,903 free ampules distributed as an advertising expense or as an amortizable good will expense" and to make a "recomputation in view of our findings as to the number of ampules."

The case was further remanded for a reconsideration of the rate of conversion issue. With respect to this issue the Court of Appeals stated:

On this admittedly very unsatisfactory and unclear state of the law; (a) because of the efforts of petitioner to have us consider evidence not introduced below (by taking judicial notice of it); (b) because of the flat statements of the petitioner that Title 31, § 372(b) and (c) controls not only conversion of foreign currencies with respect to Custom's collection of duties, but also with respect to all tax matters, and the failure of either side to present controlling law or convincing analogy; (c) because Barr v. United States, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765, although referring specifically to "the search which has been made for a measure of the true dollar value of *imported merchandise for customs purpose";* and the right of Congress "to choose any standard of evaluation *for the assessment and collection of duties",* allegedly prevents any

judicial review of the determination and certification by the Federal Reserve Bank of New York, of the *"buying rate"* to be used in all foreign currency conversion to which the Commissioner states this case "has no bearing" on our problem: (d) because petitioner seeks to be released by this court from his stipulation with respect to Joint Exhibit 23-P [table professing to set forth official and commercial exchange rates]; (e) because Exhibit C [page 1703 of the December 1950 issue of the Federal Reserve Bulletin] in the Appendix, attached to Appellant's Brief, if properly introduced into evidence, indicates there was no such thing as an authorized "commercial rate" or "free rate", or "preferential rate", or anything other than a "basic" foreign exchange rate for Argentine pesos prior to the end of June, 1950; (f) because the Commissioner in support of the Tax Court relies almost exclusively on "blocked currency" cases; (g) because the Commissioner relies on "inevitable conclusions" that do not seem to be required by the cases submitted, which largely rest on a different factual basis; and (h) because we believe the matter must be remanded to the Tax Court for recomputation in view of our findings as to number of ampules * * * we reverse the Tax Court on the issue of conversion values and remand for further exploration of the law and the fact, and a proper determination of that issue. [487 F. 2d at 48.]

The Court of Appeals notes that Argentine pesos were not blocked in early 1950 and, as will be noted from the above quote, indicates that blocked currency cases may not be necessarily relied upon in the case at bar.

Pursuant to the circuit court's mandate, we conducted a further trial to receive additional evidence. Both parties submitted additional evidence concerning the proper conversion rate. No additional evidence was presented with respect to the treatment of the 63,903 ampules which were distributed free of charge.

Except to the extent necessary to an understanding of this opinion, we shall not restate the extensive findings of fact set forth in our original opinion. See 54 T.C. 1366-1383 (1970). On appeal petitioner adopted those findings "as a faithful statement of the evidence." Pertinent facts are also summarized in the Court of Appeals decision. *Durovic v. Commissioner, supra.*

### Rate of Exchange

We found in our original decision that petitioner, while a resident of Argentina, acquired the drug Krebiozen in raw material (powder) form from one Juan Tanoira, also a resident of Argentina, on January 26, 1950, for M$N 3,005,000 (Argentine pesos). On February 7, 1950, petitioner brought this property into the United States as a biological product without the

payment of duty and contributed it as his investment in an equal partnership (Duga Illinois) with his brother, Dr. Stevan Durovic. The powder was later used in making 200,000 ampules of Krebiozen.

Petitioner's basis, and consequently the partnership's basis, in the powder used in making the drug, in terms of Argentine pesos, was M$N 3,005,000. As earlier noted, we adopted the "commercial" rate of 9.66 pesos to the dollar as the proper rate of conversion. We are directed to reconsider our measurement of that basis in terms of U.S. dollars.

It is fundamental to our tax system that the determination of the amount of the cost of goods sold herein must be measured in U.S. dollars. Cf. *Estate of Jan Willem Nienhuys,* 17 T.C. 1149, 1163 (1952). See also *Edmond Weil, Inc. v. Commissioner,* 150 F. 2d 950 (2d Cir. 1945); *Willard Helburn, Inc.,* 20 T.C. 740 (1953); *James A. Wheatley,* 8 B.T.A. 1246, 1249 (1927). In converting the M$N 3,005,000 into U.S. dollars, the critical date is January 26, 1950, the date of petitioner's purchase of the drug in its raw material form.

The issue is complicated by the apparent existence of a number of different exchange rates during this time period and the various descriptive terms applied to them.

Petitioner, now relying upon page 1703 of the December 1950 issue of the Federal Reserve Bulletin,[2] submits that the only rate in existence and, therefore, the applicable conversion rate should be 29.778 cents per Argentine peso, (3.3582 pesos per dollar), the "buying" rate in New York for cable transfers at noon on January 26, 1950. Petitioner refers to this as "the basic buying rate." It is noted that use of this rate would result in a rounded figure of 3.36 pesos to the dollar which petitioner urged at the original trial. Petitioner argues that this is the only rate of conversion for such Argentine goods imported into the United States as of January 26, 1950, and that his position is confirmed by the circular issued by the Central Bank of Argentina dated October 3, 1949. He insists that the transaction here involved was a commodity transaction since, in effect, the powder was an imported good.

[2] See table on pp. 485–487.

## FOREIGN EXCHANGE RATES

[Averages of certified noon buying rates in New York for cable transfers. In cents per unit of foreign currency]

| Year or month | Argentina (peso) | | | Australia (pound) | | Belgium (franc) | "Bank notes" account | Brazil (cruzeiro) | | Canada (dollar) | | Ceylon (rupee) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Basic | Preferential | Free | Official | Free | | | Official | Free | Official | Free | |
| 1944 | 29.773 | | | 322.80 | | 2.2860 | | 6.0594 | 5.1469 | 90.909 | 89.853 | ---- |
| 1945 | 29.773 | | | 322.80 | 321.17 | 2.2829 | | 6.0602 | 5.1802 | 90.909 | 90.485 | ---- |
| 1946 | 29.773 | | | | 321.34 | 2.2817 | | 6.0602 | ---- | 95.198 | 93.288 | ---- |
| 1947 | 29.773 | | | | 321.00 | 2.2816 | | 5.4403 | ---- | 100.000 | 91.999 | ---- |
| 1948 | 29.773 | | | | 321.22 | 2.2009 | 2.1407 | 5.4406 | 5.4406 | 100.000 | 91.691 | ---- |
| 1949 | 29.774 | | | | 293.80 | 1.9998 | | 5.4406 | 5.4406 | 97.491 | 92.881 | 27.839 |
| 1949— Dec. | 29.778 | | | | 223.16 | 2.0003 | | 5.4406 | 5.4406 | 90.909 | 88.407 | 20.850 |
| 1950— Jan. | 29.778 | | | | 223.16 | 1.9993 | | 5.4406 | 5.4406 | 90.909 | 89.205 | 20.850 |
| Feb. | 29.778 | | | | 223.16 | 1.9966 | | 5.4406 | 5.4406 | 90.909 | 89.820 | 20.850 |
| Mar. | 29.778 | | | | 223.16 | 1.9912 | | 5.4406 | 5.4406 | 90.909 | 90.254 | 20.850 |
| Apr. | 29.778 | | | | 223.16 | 1.9921 | | 5.4406 | 5.4406 | 90.909 | 90.205 | 20.850 |
| May | 29.778 | | | | 223.16 | 1.9866 | | 5.4406 | 5.4406 | 90.909 | 90.110 | 20.850 |
| June | 29.778 | | | | 223.16 | 1.9835 | | 5.4406 | 5.4406 | 90.909 | 90.456 | 20.851 |
| July | 29.778 | | [2]11.100 | | 223.16 | 1.9837 | | 5.4406 | 5.4406 | 90.909 | 90.766 | 20.850 |
| Aug. | [3]29.778 | | [3]11.100 | | 223.16 | 1.9838 | | 5.4406 | 5.4406 | 90.909 | 90.844 | 20.850 |
| Sept. | 20.000 | 13.333 | 7.205 | | 223.16 | 1.9876 | | 5.4406 | 5.4406 | 90.909 | 90.844 | 20.850 |
| Oct. | 20.000 | 13.333 | 7.291 | | 223.16 | 1.9876 | [4]1.9702 | 5.4406 | 5.4406 | ([5]) | [6]94.854 | 20.850 |
| Nov. | 20.000 | 13.333 | 7.147 | | 223.16 | 1.9876 | 1.9737 | 5.4406 | 5.4406 | ---- | 96.044 | 20.850 |

See footnotes at end of table.

486

## FOREIGN EXCHANGE RATES—Continued

| Year or month | Colombia (peso) | Czechoslovakia (koruna) | Denmark (krone) | France (franc) Official | France (franc) Free | Germany (deutsche mark) | India[7] (rupee) | Mexico (peso) | Netherlands (guilder) | New Zealand (pound) | Norway (krone) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1944 | 57.272 | --- | --- | --- | --- | --- | 30.122 | 20.581 | --- | 324.42 | --- |
| 1945 | 57.014 | --- | --- | --- | 1.9711 | --- | 30.122 | 20.581 | --- | 323.46 | --- |
| 1946 | 57.020 | 2.0060 | 20.876 | --- | .8409 | --- | 30.155 | 20.581 | 37.933 | 322.63 | 20.176 |
| 1947 | 57.001 | 2.0060 | 20.864 | --- | .8407 | --- | 30.164 | 20.577 | 37.813 | 322.29 | 20.160 |
| 1948 | 57.006 | 2.0060 | 20.857 | .4929 | .3240 | --- | 30.169 | 18.860 | 37.760 | 350.48 | 20.159 |
| 1949 | --- | 2.0060 | 19.117 | .4671 | .3017 | --- | 27.706 | 12.620 | 37.668 | 365.07 | 18.481 |
| 1949—Dec. | --- | 2.0060 | 14.494 | --- | .2862 | --- | 20.870 | 11.572 | 34.528 | 277.29 | 14.015 |
| 1950—Jan. | --- | 2.0060 | 14.494 | --- | .2863 | --- | 20.870 | 11.572 | 26.289 | 277.29 | 14.015 |
| Feb. | --- | 2.0060 | 14.494 | --- | .2863 | --- | 20.870 | 11.572 | 26.278 | 277.29 | 14.015 |
| Mar. | --- | 2.0060 | 14.494 | --- | .2863 | --- | 20.870 | 11.571 | 26.257 | 277.29 | 14.015 |
| Apr. | --- | 2.0060 | 14.494 | --- | .2860 | --- | 20.870 | 11.564 | 26.267 | 277.29 | 14.015 |
| May | --- | 2.0060 | 14.494 | --- | .2859 | --- | 20.870 | 11.564 | 26.262 | 277.29 | 14.015 |
| June | --- | 2.0060 | 14.494 | --- | .2856 | --- | 20.870 | 11.563 | 26.264 | 277.29 | 14.015 |
| July | --- | 2.0060 | 14.494 | --- | .2856 | [8] 23.838 | 20.871 | 11.571 | 26.265 | 277.29 | 14.015 |
| Aug. | --- | 2.0060 | 14.494 | --- | .2854 | 23.838 | 20.870 | 11.573 | 26.252 | 277.29 | 14.015 |
| Sept. | --- | 2.0060 | 14.494 | --- | .2855 | 23.838 | 20.870 | 11.572 | 26.236 | 277.29 | 14.015 |
| Oct. | --- | 2.0060 | 14.494 | --- | .2856 | 23.838 | 20.870 | 11.571 | 26.237 | 277.29 | 14.015 |
| Nov. | --- | 2.0060 | 14.494 | --- | .2856 | 23.838 | 20.870 | 11.571 | 26.232 | 277.29 | 14.015 |

See footnotes at end of table.

FOREIGN EXCHANGE RATES—Continued

| Year or month | Philippine Republic (peso) | Portugal (escudo) | South Africa (pound) | Spain (peseta) | Straits Settlements (dollar) | Sweden (krona) | Switzerland (franc) | United Kingdom (pound) Official | United Kingdom (pound) Free | Uruguay (peso) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1944 | --- | --- | 398.00 | --- | --- | --- | --- | 403.50 | --- | 65.830 | 53.506 | --- |
| 1945 | --- | --- | 399.05 | 9.132 | --- | --- | --- | 403.50 | 403.02 | 65.830 | 55.159 | --- |
| 1946 | --- | 4.0501 | 400.50 | 9.132 | --- | 25.859 | 23.363 | | 403.28 | 65.830 | 56.280 | --- |
| 1947 | --- | 4.0273 | 400.74 | 9.132 | --- | 27.824 | 23.363 | | 402.86 | 65.830 | 56.239 | --- |
| 1948 | --- | 4.0183 | 400.75 | --- | --- | 27.824 | 23.363 | | 403.13 | 65.830 | 56.182 | --- |
| 1949 | 49.723 | 3.8800 | 366.62 | --- | 42.973 | 25.480 | 23.314 | | 368.72 | 65.830 | 56.180 | 42.553 |
| 1949— Dec. | 49.687 | 3.4817 | 278.33 | --- | 32.692 | 19.333 | 23.289 | | 280.07 | 65.833 | 56.180 | 42.553 |
| 1950— Jan. | 49.617 | 3.4856 | 278.38 | --- | 32.717 | 19.333 | 23.281 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Feb. | 49.615 | 3.4673 | 278.38 | --- | 32.713 | 19.333 | 23.264 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Mar. | 49.613 | 3.4587 | 278.38 | --- | 32.722 | 19.333 | 23.269 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Apr. | 49.613 | 3.4595 | 278.38 | --- | 32.734 | 19.333 | 23.286 | | 280.07 | 65.833 | 56.180 | 42.553 |
| May | 49.616 | 3.4577 | 278.38 | --- | 32.761 | 19.333 | 23.291 | | 280.07 | 65.833 | 56.180 | 42.553 |
| June | 49.625 | 3.4788 | 278.38 | --- | 32.807 | 19.333 | 23.138 | | 280.07 | 65.833 | 56.180 | 42.553 |
| July | 49.625 | 3.4539 | 278.38 | --- | 32.818 | 19.333 | 23.047 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Aug. | 49.625 | 3.4498 | 278.38 | --- | 32.825 | 19.332 | 23.012 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Sept. | 49.625 | 3.4842 | 278.38 | --- | 32.825 | 19.331 | 22.959 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Oct. | 49.625 | 3.4898 | 278.38 | --- | 32.838 | 19.332 | 22.942 | | 280.07 | 65.833 | 56.180 | 42.553 |
| Nov. | 49.625 | 3.4791 | 278.38 | --- | 32.850 | 19.332 | 22.946 | | 280.07 | 65.833 | 56.180 | 42.553 |

[1] On Aug. 29, 1950, the Argentine Finance Ministry announced a simplified exchange rate system. A rate designated "Preferential" replaced the "Preferential A" and "Preferential B" rates, and the "Special" rate was discontinued. For quotations on the discontinued rates, see BULLETIN for October 1950, p. 1419.

[2] Based on quotations beginning July 13.

[3] Based on quotations through Aug. 28.

[4] Based on quotations beginning Oct. 11.

[5] After Sept. 30, quotations for official rate abolished.

[6] Based on quotations beginning Oct. 4.

[7] Excludes Pakistan, beginning April 1948.

[8] Based on quotations beginning June 22.

NOTE.—For back figures, see *Banking and Monetary Statistics*, Table 173, pp. 662-682. For description of statistics, see pp. 572-573 in same publication, and for further information concerning rates and averages for previous years, see BULLETIN for October 1950, p. 1419; January 1950, p. 123; October 1949, p. 1291; January 1949, p. 101; July 1947, p. 933; and February 1944, p. 209.

Respondent urges that this case involves a financial transaction and that the proper conversion rate is M$N 15.00 per $1, the "parallel" rate on January 26, 1950. (This rate is also referred to as the "black market," "curb," "uncontrolled free," and "unofficial free" rate.) In the alternative respondent urges that if the Court finds that the "parallel" rate is not appropriate, then we should apply the "free" rate of exchange of 9.00 pesos per $1. (Respondent variously refers to this rate as the "commercial," "legal financial," "controlled free," "official financial," and "financial" rate. Others refer to this rate also as the "free exchange buying," "currency exchange," and "interbank" rate.)

Since, as just noted, the positions of the parties are at loggerheads as to the nature of the transaction involved, which determines in their minds the classification and thereby the rate which should be used, the case is further confused because the parties disagree as to evidence which is relevant and credible. This situation and their loose use of descriptive terms in reference to the various rates make it difficult to follow their arguments and reasoning.[3]

Petitioner's insistence that there was only one rate which is applicable (he uses the terms "commodity trading" rate, "buying" rate, and "basic buying" rate) results in his terming respondent's evidence regarding the rate of exchange of pesos for dollars (one country's currency into the currency of another country) interesting but irrelevant, immaterial, and not in litigation in this case. He urges that respondent's expert witness was not a reliable witness. He insists that there were not "official" or "commercial" rates for Argentine pesos which could be applicable in January or February 1950. He labels respondent's exhibits secured from banks (see n. 5 *infra)* "advertising and business propaganda," and states that the exchange quotations from the newspapers are not accurate or reliable and besides they give "currency" exchange rates in New York and not "trading" exchange rates for goods imported from Argentina, which he insists, is the transaction involved in this case.

Petitioner in main support of his position refers us to 31 U.S.C. sec. 372 (as in effect on the date of exchange).[4]

---

[3] In the interest of consistency we will use one descriptive term for the rates the parties propose even though they may at times use different terms for the same rate.

[4] Sec. 372. Conversion of currency—Value of foreign coin proclaimed by Secretary of

This section provides the method of converting foreign currency into U.S. dollars when necessary for the purpose of valuing merchandise imported into this country for the assessment and collection of duties. The "buying rate" mentioned in subsection (c) is the rate (or rates) set forth in the Federal Reserve Bulletin. See *Barr v. United States,* 324 U.S. 83 (1945).

Petitioner emphasizes the following language in subsection (b) in support of his contention that the above-mentioned rate is the only applicable rate: "wherever it is necessary to convert foreign currency into currency of the United States." However, we note that that phrase is limited by the introductory words which make subsection (b) applicable "For the purposes of the assessment and collection of duties." Although we believe much weight may be accorded the rates set forth in the Federal Reserve Bulletin, it is our opinion that other evidence introduced by respondent in this trial indicates that the bulletin is only one source to consider in making our determination. We also believe that since this is a tax case and not a customs case we are not necessarily bound by the rates set forth for the purpose of

Treasury

(a) The value of foreign coin as expressed in the money of account of the United States shall be that of the .pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year.

Proclaimed value basis of conversion

(b) For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after June 17, 1930, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subsection (c) of this section, shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of subsection (a) of this section, for the quarter in which the merchandise was exported.

Market rate when no proclamation

(c) If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subsection such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal Reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate ·from actual transactions and quotations in demand or time bills of exchange. June 17, 1930, c. 497, Title IV, § 522, 46 Stat. 739. [Sec. 372 was amended on Aug. 2, 1956, by ch. 887, sec. 3, 70 Stat. 946.]

conversion in the assessment and collection of duties as petitioner urges.

In this regard we note the following language concerning section 372(c) in *Barr v. United States, supra* at 93: "It hardly need be pointed out in reply, however, that our decision, like * * * [sec. 372(c)], is concerned only with the assessment and collection of duties upon imports through the use of a formula which Congress designed." [5] Compare the following language in *Cinelli v. Commissioner,* 502 F. 2d 695, 698–699 (6th Cir. 1974): [6]

To arrive at the fair market value of Spannocchia [a large estate in Italy] in U.S. dollars on May 1, 1942, a measure other than Italy's official exchange rate was needed. The normal method is to apply the free market or "commercial" rate established in New York's financial centers on the date in question. See Raffel, * * * ["Some Tax Aspects of Foreign Currencies," 14 Tax L. Rev. 389, 407-408 (1959)]. This rate is a proper measure of how many U.S. dollars a particular unit of foreign currency actually purchases in arms' length transactions. It measures actual market value, real purchasing power, of one currency in terms of another.[8] This rate is, furthermore, legislatively prescribed as the measure of the value of imported merchandise, under 31 U.S.C. § 372(c).[9] It would be remarkable for this Court to approve the use of an official exchange rate in contrast to the commercial rate which Congress has mandated as the measure to be applied in customs determinations. The customs formula is the product of a long history of congressional development, and "the formula finally selected is dependent on the actual value of the foreign currency in our money." Barr v. United States, 324 U.S. 83, 89, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945).

---

[8] The New York commercial rate is not a perfect measure of the value in U.S. dollars of particular property with a foreign currency price. As pointed out in Ravenscroft, * * * ["Taxation of Income Arising from Changes in Value of Foreign Currency," 82 Harv.L.Rev. 772, 790 (1969)], free market forces in international currency exchange do not always perform as theory would dictate. Nonetheless, commercial rates are an available and roughly accurate measure of purchase power equivalence, and in the absence of a better indication of the actual U.S. dollar value of foreign property, they are usually the best available yardstick.

[9] Under 31 U.S.C. § 372, the New York commercial rate is the rate applied for customs purposes, unless a proclaimed official rate of the U.S. Secretary of the Treasury differs less than 5% from the commercial rate.

We note further that the legislative history of section 372 [7] and its forerunners indicates that these sections were enacted for a

---

[5] The *Barr* case dealt with a multiple rate situation and held that the conversion rate actually used in the transaction was the applicable rate, not the higher "official" rate.

[6] This case involved a determination of the taxpayer's basis in an estate in Italy as of May 1, 1942. On appeal from the Tax Court's decision in *Ferdinand Cinelli,* T.C. Memo. 1973-140, the issue was whether the "official" exchange rate established by the Italian Government for converting lire into dollars or the "commercial" (black market) rate should be used. The Tax Court's use of the "commercial" (black market) rate was upheld.

[7] For the legislative history of sec. 372 and the problems of currency conversions in general see Bronz, "Conversion of Foreign Currency In Customs Administration," 34 Tex. L. Rev. 78 (1955).

dual purpose: (1) As a measure of the true dollar values of imported merchandise for custom purposes, and (2) for administrative convenience. An earlier but now obsolete purpose was the raising of revenues.

This is borne out by the following quote from *Barr v. United States, supra* at 89, wherein it is stated:

This history [referring to the legislative history of what is now sec. 372] makes clear the search which has been made for a measure of the true dollar values of imported merchandise for custom purposes which was accurate (see *Cramer v. Arthur,* 102 U.S. 612, 617) [26 L. Ed. 259] and at the same time administratively feasible and efficient. The formula finally selected is dependent on the actual value of the foreign currency in our own money. * * *

The *Cramer* case, referred to in the just-now-quoted excerpt from the *Barr* case, further bears out the fact that administrative convenience was an important purpose which the Congress had in mind in enacting legislation relating to determining value in order to estimate custom duties. On page 617 of the *Cramer* opinion, it is stated: "It would be a constant source of confusion and uncertainty if every importer could, on every invoice, raise the question of the value of foreign moneys and coins." On page 620 there is the following comment:

These transactions must be governed by the regulations in force at the time. It is of the utmost consequence to the government, and it is, on the whole, most beneficial to importers, that the value of foreign moneys should be officially ascertained, and that they should be fixed by a uniform method or rule.

This further indicates that this Court should not be necessarily bound to use the conversion rate established under section 372 for tax purposes.

Another difficulty with petitioner's position that only one applicable rate existed is that the December 1950 Federal Reserve Bulletin on its face indicates that it is incomplete with respect to the period covering January 26, 1950, the date on which the purchase occurred. Footnote 1 in that bulletin indicates the prior existence of two "Preferential" rates and a "Special" rate. See p. 487 *supra.* According to footnote 1, the discontinued rates are set forth in the October 1950 Bulletin, which was not introduced into evidence. We do not believe that the listing in the December 1950 Bulletin of only one rate for January 1950 is determinative as to whether that was the only rate in existence at that time as petitioner argues.

It is noted that petitioner apparently agrees that these export rates were in existence since he introduced into evidence the Circular of the Central Bank of Argentina, dated October 3, 1949, which sets them forth. He argues that this circular justifies his reliance on the Federal Reserve Bulletin and supports his position that a "free" rate was not in existence until July 1950 and that the conversion rate he urges of 29.778 cents per peso (3.36 pesos to the dollar) is the applicable rate. His position is that since the powder he brought into the United States on February 6, 1950, duty free, was a biological product derived from livestock, it, under the classification in the circular, was listed in such a fashion as to make it subject to the "basic buying" rate of 3.36 pesos to $1 had it been dutiable. Here again it appears that petitioner's refusal to recognize that other rates existed in January 1950, or at least the "free" rate which respondent urges, is basically because of his position that the transaction can only be considered to be a commodity transaction and that only the one rate is relevant.

Our examination of the evidence introduced by respondent [8] reveals that several different rates were in existence during January 1950. Of these the following related to the import and export of goods from Argentina:

| *Exports* | *Pesos/U.S. Dollars* |
|---|---|
| For basic merchandise _____ | [9]M$N 3.3582 |
| Preferential "A" _____ | 4.8321 |
| Preferential "B" _____ | 5.7286 |
| Special_____ | 7.1964 |
| *Imports* | *Pesos/U.S. Dollars* |
| Preferential "A" _____ | M$N 3.7313 |
| Preferential "B" _____ | 5.3714 |
| Basic_____ | 6.0857 |
| Auction rate—list "A" | |
| (1/13/50)_____ | 11.9548 |
| Auction rate—list "B" _____ | 13.2923 |

[8] Respondent's evidence regarding rates of exchange covering the period Jan. 26, 1950, consisted of correspondence with the First National Bank of Chicago, a memorandum containing rates gathered from daily newspaper reports on file in the First National Bank of Chicago, two publications of the First National Bank of Boston entitled "The Situation in Argentina" dated Oct. 31, 1949, and Feb. 27, 1950, three sets of "International Financial Statistics" published by the International Monetary Fund dated January 1950, September 1950, and February 1951, a publication of the Bank of London & South America, Ltd., entitled "Fortnightly Review," dated Feb. 11, 1950, and quotations from the Chicago Journal of Commerce and New York Times dated Jan. 26 and 27, 1950.

[9] As noted earlier, petitioner states that this rate, which is also contained in the circular of the Central Bank of Argentina, confirms his position that the Federal Reserve Bulletin sets forth the rate which should be used in this case.

Since these rates are involved in the movement of goods, they are often referred to as "commercial" rates. Since they were established by the Argentine Government, they are also referred to as "official" rates and "controlled" rates.

These rates are taken from a report covering "The Situation in Argentina" issued by the Buenos Aires branch of the First National Bank of Boston, dated February 27, 1950. This report also states that the "free exchange buying" rate was 9.01 pesos per U.S. dollar. In a footnote that report indicates that the exchange value of the peso at the "official buying" rate was 0.2978 (approximately equivalent to 3.358 pesos/dollar) with the various "selling" rates ranging from $0.2680 to $0.0860 in U.S. currency (approximately 3.3713 to 11.6279 pesos/U.S. dollar).

The term "buying" rates refers to those applicable to exports. The term "selling" rates refers to those applicable to imports.

The Argentine Government set the export and import rates in October 1949 in an effort to implement its economic policy directed at increasing foreign trade, promoting production, and establishing protection for the country's national industry. To accomplish those objectives, export goods which were more difficult to place in the export market were granted a more favorable exchange rate to stimulate sales. On the other hand, the importation of essential raw materials and primary consumer goods not available in Argentina were granted lower rates than nonessential or luxury-type articles.[10]

The Central Bank of Argentina, as the financial agent for the Government, listed commodities according to the appropriate foreign exchange rate in its circular dated October 3, 1949. Commodities (for export) not covered on the lists were to be treated under the "Preferential 'A' " rate.

As noted earlier petitioner has presented us with this list of export commodities. It is this list which is the basis for his urging that the "basic buying" rate of 3.36 pesos to the dollar confirms his reliance on the Federal Reserve Bulletin. From our review of this evidence it appears that the drug Krebiozen in its raw form (derived from the blood serum of horses) is not covered by any of the lists. Consequently, if it were assumed that the drug was

---

[10] Derived from the First National Bank of Boston's report on Argentina dated Oct. 31, 1949.

exported, in our opinion the "Preferential 'A'" export rate, not the "basic buying" rate, which petitioner urges, would have applied.[11]

In addition to the exchange rates relating to the importation and exportation of goods, we find that there were also "free" exchange rates during January 1950.

As summarized earlier, respondent submits that the "free" rates should apply. (Basically the "free" rates in this instance applied to transactions in currencies of the two countries.)

Respondent first urges that the "free" rate we should apply is the "parallel" (black market) rate. The evidence indicates that this rate usually applies where a country has controls imposed on exchange rates for various purposes as was the case in Argentina in January 1950. It primarily develops as a result of currency exchange transactions outside the country involved, since such transactions are usually prohibited within the country which has a controlled currency. It is referred to as a "free" rate in the sense that it applies to uncontrolled transactions in currency and the rate varies considerably.

Alternatively, respondent argues that the "free" (financial) rate should be applied. Various "free" exchange rate quotations are set forth below:

> *Bank of London & South America Limited Fortnightly Review*
> (dated Feb. 11, 1950—listing quotations ruling
> in Buenos Aires for telegraphic transfers on
> Jan. 24, 1950)
>
> | *Free market rates* [12] | *Pesos/U.S. Dollar* |
> |---|---|
> | Buying _____ | 8.99 |
> | Selling _____ | 9.01 |
>
> *New York Times* (Jan. 27, 1950, listing Jan. 26,
> 1950, quotations on foreign exchange)
> *Argentina*—9 pesos to the dollar
> Cables (free)—11.25 (cents/peso)
> (for comparison, approximately M$N 8.89/U.S.
> dollar)
> *Chicago Journal of Commerce* (Jan. 27, 1950, listing
> Jan. 26, 1950, closing cable quotation in
> Chicago on the Foreign Exchange) (cents/peso)

---

[11] Petioner states that he is "not relegated to [the] Preferential 'A' rate because the goods exported is a biological product deriving from livestock and within the scope of the basic buying rate" list.

[12] The Bank of London & South America, Ltd., "Fortnightly Review" stated that free market rates were used "for all remittances other than the payment of exports and imports."

Argentina (pesos)
Buying ___   11.15
Selling ___   11.15
(for comparison, approximately M$N 8.97/U.S. dollar)

A more comprehensive listing of various rates follows:

INTERNATIONAL FINANCIAL STATISTICS, IV (February 1951)
(published by International Monetary Fund)

(Pesos per U.S. Dollar: Average or prevailing rate)

| Argentina — Exchange rates — Selling rates | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1950 | | | | | | |
| Preferential | 3.73 | 3.73 | 3.73 | 3.73 | 3.73 | 3.73 | 3.73 | [3]3.73 | 5.00 | 5.00 | 5.00 | 5.00 |
| | 5.37 | 5.37 | 5.37 | 5.37 | 5.37 | 5.37 | 5.37 | [3]5.37 | | | | |
| Basic | 6.09 | 6.09 | 6.09 | 6.09 | 6.09 | 6.09 | 6.09 | [3]6.09 | 7.50 | 7.50 | 7.50 | 7.50 |
| Auction | 12.05 | 10.76 | 11.73 | 11.73 | 12.29 | 12.29 | [7]12.53 | [3]12.53 | -- | -- | -- | -- |
| | 13.26 | 13.17 | 13.62 | 13.62 | 12.77 | 12.77 | 12.53 | 12.53 | -- | -- | -- | -- |
| Free | 9.02 | 9.02 | 9.02 | 9.02 | 9.02 | 9.02 | 9.02 | [3]9.02 | 13.65 | 13.63 | 14.05 | 14.60 |
| Curb* | 15.15 | 14.80 | 13.90 | 13.75 | 13.95 | 13.74 | 15.50 | 17.25 | 18.05 | 19.65 | 19.55 | 19.50 |
| Buying rates | | | | | | | | | | | | |
| Special | 7.20 | 7.20 | 7.20 | 7.20 | 7.20 | 7.20 | 7.20 | [3]7.20 | 7.50 | 7.50 | 7.50 | 7.50 |
| | 4.83 | 4.83 | 4.83 | 4.83 | 4.83 | 4.83 | 4.83 | [3]4.83 | 7.50 | 7.50 | 7.50 | 7.50 |
| Preferential | 5.73 | 5.73 | 5.73 | 5.73 | 5.73 | 5.73 | 5.73 | [3]5.73 | 7.50 | 7.50 | 7.50 | 7.50 |
| Basic | 3.36 | 3.36 | 3.36 | 3.36 | 3.36 | 3.36 | 3.36 | [3]3.36 | 5.00 | 5.00 | 5.00 | 5.00 |

[3] Through Aug. 28.
[7] Beginning July 19.
* Curb rate at end of period.

The "free" rates were used for limited permitted remittances other than the payment of exports and imports.

International Financial Statistics, III, September 1950, published by the International Monetary Fund, also indicates that from October 3, 1949, and prior to August 29, 1950, the "free" selling rate was 9.02 pesos to the dollar and the "free" buying rate was 8.98 pesos to the dollar. This publication further indicates that the "free" selling rate was used for "permitted financial remittances" and the "free" buying rate for "financial remittances." Respondent's expert witness gave as examples of such permitted transactions the payment of royalties and medical bills in the United States.

. We note that the various sources introduced into evidence indicate small variations from this rate, but we believe these differences may be due mainly to differences in bank charges and commissions.

The record in this case convinces us that the "free" rate was an "official" rate established by the Argentine Government for permitted financial transactions and we find that that rate was 9 pesos per U.S. dollar. On August 29, 1950, the Argentine Central Bank lowered this rate to 14.25 pesos per U.S. dollar and announced that thereafter it would be a floating rate.

In our judgment the transaction involved in this case was a financial transaction. It was not a commodity transaction as petitioner contends involving the importation of Argentine goods into the United States. Compare *Canton R. Co. v. Rogan,* 340 U.S. 511 (1951). Petitioner purchased the drug (and the incidental rights to its profits) while residing in Argentina from another Argentine resident, making payment in pesos. The value was determined largely by the seller's (Tanoira's) advances to Dr. Stevan Durovic to finance the production and exploitation of the drug. See 54 T.C. at 1373-1375.

We hold that the proper rate of exchange to be employed in determining the value, in U.S. dollars, of M$N 3,005,000, which petitioner paid for the powder, is the "free" rate of 9 pesos per U.S. dollar.

In arriving at our holding, we have rejected respondent's use of the "curb" or "black market" rate. That exchange, if it be called such, was largely a market for selling pesos to obtain U.S. dollars or other foreign currencies. The Argentine Government, in its effort to control its currency, prohibited the purchase of foreign

currency except through authorized channels. Therefore, it was an unauthorized rate in Argentina, and such trading, as far as we can ascertain, occurred primarily outside of that country (in Montevideo, Uruguay, for example). It was a highly elastic rate and, in our judgment, not a fair indicator of the value of the peso.

We have also rejected petitioner's use of the export rate. It was a controlled, artificial rate designed to stimulate and stabilize Argentina's economy. For this reason it did not reflect the true value of the peso. Since we have found that a financial transaction was involved herein and that the "official" rate of exchange of 9 pesos per U.S. dollar was the rate of exchange applicable to permitted financial remittances, we have also rejected petitioner's contention that the "basic buying rate" established by the Federal Reserve Bank of New York for January 26, 1950, is the proper rate for such a transaction.

### Treatment of the Distribution of the 63.903 Ampules Without Charge

As we stated in the opening portion of this opinion, this case was also remanded for a redetermination of the tax treatment of the distribution of the 63,903 ampules without charge.

After petitioner entered the United States, the drug in its raw material form was manufactured into 200,000 ampules; 63,903 of these ampules were then distributed free of charge between February 7, 1950, and April 15, 1954, to certain doctors and institutions for experimentation and other evaluation as to their value in treating cancer.

On appeal from our original decision, the Seventh Circuit stated:

> We think it rather obvious that before Krebiozen could be sold in the United States, it would require certain approval and acceptance from the medical profession, from medical schools and from certain governmental agencies. It is undisputed factually that 63,903 ampules were so distributed without charge for such purposes.

> We think that the attempt to gain acceptance of the drug Krebiozen by giving away samples to responsible physicians and medical schools was as much a business expense as the giving away of drug samples to physicians or tooth paste samples to dentists.[10]

> Goods distributed free of charge should be treated as an expense for promoting good will,[11] or as an advertising expense, deductible as an ordinary and necessary business expenditure.[11a] Whatever way the expense of the goods distributed free of charge is to be deducted, they must have some cost for tax

purposes. For this reason it is essential that the cost of producing the ampules should be spread over the 200,000 ampules actually produced. This case must be remanded, then, to permit the Tax Court to determine whether the taxpayer is to get a deduction for the cost of the 63,903 free ampules distributed as an advertising expense or as an amortizable good will expense.

[10] As the Tax Court said in its opinion, with respect to another issue, "After all, 'Taxation is a practical matter' and should therefore, attempt to capture the realities of the situation in question." (Opinion, at 1390).

[11] Compare Liberty Insurance Bank, 14 B.T.A. 1428, 1435 (1929), with Northwestern Yeast Co., 5 B.T.A. 232, 237 (1926).

[11a] Cf. Richmond Hosiery Mills v. Commissioner of Internal Revenue, 29 F.2d 262 (5th Cir. 1928). [Durovic v. Commissioner, supra at 44.]

The Court of Appeals affirmed our determination that the cost of producing the ampules should be spread over the entire 200,000 ampules produced, rather than only over the 136,097 ampules on hand in 1954 which were subsequently sold. The proportionate cost of the 63,903 ampules distributed without charge is, therefore, the amount of the expenditures in issue here.

Petitioner contends that the proportionate cost of producing the 63,903 ampules distributed free of charge should be ratably allocated over the years in which the remaining 136,097 ampules were sold. This argument treats the free distributions as capital expenditures and amortizes them over the remaining life of the partnership (Duga Illinois).

Alternatively, he argues that the free distributions of ampules should be deductible as ordinary and necessary business expenses. And since the partnership had no income during the years in which the free distributions were made, a net operating loss resulted in those years which could be carried forward to the years the partnership generated income.

Respondent contends that the benefits derived from the free distributions lasted beyond the years in which such distributions were made. As such, they must be capitalized and amortized over their useful life in petitioner's business, rather than deducted as ordinary and necessary business expenses. However, he contends these expenditures were either for goodwill or research and experimentation, and in either case had an indeterminate useful life. He concludes, therefore, that amortization should not be allowed.

At the trial on remand, neither party presented additional evidence on the question of the proper treatment of these expenditures. Petitioner asserts that all the evidence necessary to reach a determination on this issue is already in the record.

We do not believe that the Seventh Circuit's directives indicate that we must necessarily grant petitioner some kind of deduction. Rather, we think that court has directed us to determine whether such distributions were advertising expenses or expenditures for goodwill, and if the latter, whether they are amortizable.

In our judgment the distributions of ampules without charge constituted capital expenditures (in the nature of goodwill, as that term is employed by the Seventh Circuit) related to the research, development, and distribution of the drug. Cf. *Hart-Bartlett-Sturtevant Grain Co. v. Commissioner,* 182 F. 2d 153 (8th Cir. 1950), affg. 12 T.C. 760 (1949). The distributions were not deductible as ordinary and necessary business expenses (e.g., as for advertising). *Liberty Insurance Bank,* 14 B.T.A. 1428 (1929), revg. on other grounds 59 F. 2d 320 (6th Cir. 1932); *Northwestern Yeast Co.,* 5 B.T.A. 232 (1926). See also *Houston Natural Gas Corp.,* 34 B.T.A. 228 (1936), affd. 90 F. 2d 814 (4th Cir. 1937), cert. denied 302 U.S. 722 (1937). Since Duga Illinois was not engaged in any other business and did not distribute Krebiozen for sale during the years it was distributed free of charge, it appears obvious to us the reason behind the free distributions was to establish the drug's acceptance and efficacy in the medical world so that it could be licensed for sale in later years. As such, the benefits to be derived from the free distributions clearly were of a lasting nature, and such expenditures must be capitalized.[13]

The key issue, as we see it, is whether petitioner is entitled to amortize these expenditures.[14]

---

[13] We note that most of the free distributions here occurred before the taxable year 1954. However, we have only the taxable years 1954 though 1958 before us. Consequently, even if we were to decide these distributions were deductible as ordinary and necessary business expenses, we would be powerless to grant petitioner relief. Further, under sec. 1.702-2, Income Tax Regs., net operating losses of the partnership under sec. 172 are deducted on the individual partners' tax returns where they may then be carried backward or forward on such *individuals'* income tax returns to other years. The partnership itself is not entitled to carry back or carry over such losses.

[14] Sec. 174, I.R.C. 1954, is not applicable here. See n. 29 of our original opinion, 54 T.C. at 1395, where we stated:

"See sec. 174 which, in part, permits a taxpayer to treat research and experimental costs, paid or incurred in a taxable year subsequent to Dec. 31, 1953, as noncapital expenditures. Since, as petitioner states on brief, 'substantially all the costs in question were incurred prior to the effective date [of sec. 174] of the Internal Revenue Code of 1954,' the tax treatment of such costs is governed by the case law pertinent to pre-1954 Code years. The rules developed by these cases are summarized in the following language from *John F. Koons,* 35 T.C. 1092, 1099 (1961):

"Amortization" here means depreciation of an intangible asset. Petitioner argues that he should be allowed to amortize these expenditures ratably over the years in which the remaining 136,097 ampules were sold. We think this means that the portion of the 136,097 ampules sold in any one year would be the proportionate amount of the cost of the 63,903 ampules deducted in that year. However, this method has the same effect as spreading the total cost of goods sold only over the 136,097 ampules on hand in 1954, rather than over the entire 200,000 ampules produced. We rejected this method in our original opinion and were affirmed by the Seventh Circuit. 487 F. 2d at 44. Moreover, we need not determine if petitioner's method (or any other method) of amortization is reasonable, because it is our conclusion that no amortization is allowable with respect to the expenditures here.

Not all intangible assets are subject to allowances for amortization. Referring to the predecessor of section 167, the court in *Pohlen v. Commissioner,* 165 F. 2d 258, 259 (5th Cir. 1948), stated:

A deduction for depreciation is expressly limited to the reasonable allowance for exhaustion, wear and tear of property used in business or in the production of income. Thus the statute does not include all property. There are even some kinds of property used in business on which depreciation is not allowable because none is sustained, and other property on which it is not allowable because any exhaustion which may occur is not susceptible of accurate measurement. Accordingly, in order to establish the right to depreciation, it is necessary to show that the property, whether tangible or intangible, will become exhausted within a definite period, which is known as its useful life, and which can be ascertained from specific terms, such as a contract, or can be determined from available facts. [Fn. refs. omitted.]

---

'Prior to the enactment of the Code of 1954 there was no statutory provision dealing with the tax treatment to be accorded research and experimental expenditures, and the taxpayer had no option to treat such costs as deductible expenses. To the extent that they were ordinary and necessary business expenses they were deductible; to the extent that they were capital they could be capitalized and were recoverable through depreciation or amortization where the useful life was determinable. *Gilliam Manufacturing Co.,* 1 B.T.A. 967 (1925); *Hazeltine Corporation,* 32 B.T.A. 110 (1935), affirmed on this issue 89 F. 2d 513 (C.A. 3, 1937); *Claude Neon Lights, Inc.,* 35 B.T.A. 424 (1937); *Hart-Bartlett-Sturtevant Grain Co.,* 12 T.C. 760 (1949), affd. 182 F. 2d 153 (C.A. 8, 1950); *Red Star Yeast & Products Co.,* 25 T.C. 321, 341, 343 (1955). In the event, however, that they were not ordinary and necessary expenses and a period of useful life could not be definitely ascertained, the amortization of such expenditures was not allowable.' "

(See also Jack R. Miller, "Research and Development Costs," 7th Ann. N.Y.U. Tax Inst. 134 (1949).)

Pursuant to the directives of the Seventh Circuit, we have determined the free distributions here were capital expenditures in the nature of goodwill. Goodwill is an intangible asset which is ordinarily considered as nonamortizable.[15] As stated in *Houston Chronicle Publishing Co. v. United States,* 481 F. 2d 1240, 1247 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974):

Some intangible capital assets are, of course, non-amortizable as a matter of law, with the most frequently litigated example being the "goodwill" of an ongoing business. Treasury Regulation §1.167(a)-3 specifically provides, "No deduction for depreciation is allowable with respect to goodwill," and the cases are consistent in applying that regulation strictly. *E.g.,* Winn-Dixie Montgomery, Inc. v. United States, 5 Cir. 1971, 444 F. 2d 677; United States v. Cornish, 9 Cir. 1965, 348 F. 2d 175; Dodge Brothers, Inc. v. United States, 4 Cir. 1941, 118 F. 2d 95. Indeed, this proposition is so well settled that the only question litigated in recent years regarding this area of the law is whether a particular asset is "goodwill."

Section 1.167(a)-3, Income Tax Regs., referred to by the court in *Houston Chronical* has remained substantially unchanged since 1918 and its provisions have been in effect through successive reenactments of the Code. It, therefore, has acquired the force and effect of law. *Helvering v. Winmill,* 305 U.S. 79, 83 (1938); *Commissioner v. Indiana Broadcasting Corp.,* 350 F. 2d 580, 581 (7th Cir. 1965).

In *Computing & Software, Inc.,* 64 T.C. 223, 232-233 (1975), we were distinguishing customer credit information files, which were amortizable, from goodwill, which was not amortizable, when we said:

The "nature of goodwill" is the expectancy that "the old customers will resort to the old place." * * * The essence of the concept of goodwill is a preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely. * * * Thus, the useful life of goodwill is not susceptible to reasonable estimation. [Citations omitted.]

It is not always clear whether courts are viewing goodwill as nonamortizable because not an exhaustible asset, or whether it is nonamortizable because, although exhaustible, no useful life can be reasonably estimated for it. In either case, however, courts reach the same conclusion: goodwill is not amortizable.

---

[15] *Robert G. Tomlinson,* 58 T.C. 570, 581 (1972), affd. 507 F. 2d 723 (9th Cir. 1974); *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78, 88-90 (1968), appeals dismissed nolle prosse (4th Cir. 1968) and (D.C. Cir. 1969); cf. *Clarke v. Haberle Crystal Springs Brewing Co.,* 280 U.S. 384 (1930).

Some commentators are arguing that a change in attitude with respect to the amortization of goodwill is now appropriate. See Gregorcich, "Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill," 28 The Tax Lawyer 251 (Winter 1975). This view suggests that if a reasonably estimated useful life can be established for purchased goodwill, amortization ought to be allowed. Because of the problems in establishing such useful life, however, the inevitable conclusion is that legislative assistance is necessary.

Our problem with the present case centers around the Seventh Circuit's use of the phrase "amortizable goodwill expense." We are unsure of the precise meaning and intent of that court's directives with respect to this phrase. We know the term "goodwill" can have different meanings in different contexts. *KFOX, Inc. v. United States,* 510 F. 2d 1365, 1376 (Ct. Cl. 1975); *Meredith Broadcasting Co. v. United States,* 405 F. 2d 1214, 1224 (Ct. Cl. 1968). See also Gregorcich, "Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill," *supra* at 271-276. In a broad sense goodwill may refer to all the intangible assets of the business enterprise including such items as trademarks, patents, franchises, contracts, etc. (some of which are amortizable). In a narrow sense goodwill has its traditional meaning regarding favorable customer relations, i.e., the reasonable expectancy that old customers will return to the old place of business without contractual compulsion. *Meredith Broadcasting Co. v. United States, supra* at 1224; *Karan v. Commissioner,* 319 F. 2d 303, 306 (7th Cir. 1963); *Computing & Software, Inc., supra* at 232. It is this narrower meaning we refer to when we use the word "goodwill," and indeed the Seventh Circuit has defined goodwill this way in the past. *Karan v. Commissioner, supra* at 306. And it is goodwill in this sense that the court in *Houston Chronicle Publishing Co. v. United States, supra,* was referring to when it concluded goodwill was nonamortizable as a matter of law. 481 F. 2d at 1247. But regardless of how goodwill is defined, to the extent an intangible asset is identifiable and separable from this narrower concept of promoting continued customer relations, the asset may be amortized provided it is of an exhaustible nature and has an ascertainable depreciation basis and useful life. *Union Bankers Insurance Co.,* 64 T.C. 807 (1975); *Computing & Software, Inc.,*

*supra.* It is within this definitional framework that we view the instructions of the Seventh Circuit in the present case.

We believe the distributions of ampules without charge served more than one purpose. To some extent these expenditures were promotional costs incurred to gain acceptance of the drug in the medical profession and thereby establish a market for sales in later years. As such they were capital expenditures for goodwill, as the Seventh Circuit has suggested. But in addition, the free distributions were part of the research and experimental costs of the drug. As we found in our original opinion:

Convinced that the drug was nontoxic, Stevan [petitioner's brother] and [Dr. Andrew C.] Ivy made it available free of charge on an experimental basis to physicians whose patients were suffering from advanced or terminal cancer. Detailed diagnostic forms were also supplied to these physicians who were requested to summarize their observations and return the completed forms to Ivy. Ivy was in charge of collating these forms and appraising the results which they reflected. [54 T.C. at 1376.]

Petitioner has made no attempt to allocate a portion of these expenditures to research and experimental costs as opposed to goodwill (and thereby sever a portion of these costs from goodwill). Indeed, petitioner does not refer to these expenditures as either goodwill or research costs. Rather, he considers them only as capital expenditures which are amortizable. Respondent, on the other hand, acknowledges the possibility of considering them as either goodwill or research expenditures. The Seventh Circuit, in its opinion in this case, has seemingly brought them all under the umbrella of goodwill (although we are somewhat unsure of how they have defined that term).

It is not necessary under the circumstances of this case for us to decide what portion of the costs is allocable to goodwill and what portion is allocable to research and experimentation. To the extent the expenditures were for goodwill, they are nonamortizable as a matter of law. To the extent the expenditures were for research and experimentation, they are nonamortizable because no "reasonably" ascertainable useful life can be ascribed to them.

We cannot conclude, as petitioner does, that the benefits derived from the free distribution of ampules would last only over the time period in which the remaining 136,097 ampules on hand in 1954 were sold (after which the partnership, Duga

Illinois, terminated).[16] Rather, we think such benefits would continue indefinitely as long as the drug could be produced and marketed commercially.

Petitioner is, in essence, employing a hindsight test for useful life to show how long he actually continued in the business of selling Krebiozen. However, hindsight also shows us that petitioner's brother continued the production and distribution of Krebiozen after termination of the partnership in 1959. This latter fact indicates the drug was commercially marketable after the years in issue. But we cannot rely on hindsight evidence to ascertain a useful life for the expenditures here. *Western Terminal Co. v. United States,* 412 F. 2d 826 (9th Cir. 1969). The estimation of useful life is not to be made years after the amortization deductions are to begin. On the contrary, the useful life must be reasonably ascertainable at the close of the year for which the return is filed. *Roy H. Park Broadcasting, Inc.,* 56 T.C. 784, 805 n. 10 (1971); *Toledo TV Cable Co.,* 55 T.C. 1107, 1117 (1971), affd. per curiam 483 F. 2d 1398 (9th Cir. 1973).[17] Petitioner contends amortization deductions are to begin in 1954. We think, therefore, that at that time the useful life of the expenditures in question must be subject to reasonable estimation. On the record before us, we cannot find that at the close of the year 1954 there was any reasonable way of estimating how long petitioner's business would benefit from these expenditures. Consequently, petitioner's contention that the free distribution of 63,903 ampules should be amortized only over the period in which the remaining 136,097 ampules were sold is rejected.

What we said in our original opinion with respect to other research expenditures is equally applicable here:

In the case at bar, we think it is clear that the expenditures for research and experimentation were calculated to perfect and improve Krebiozen so that it might be licensed for sale on a nonexperimental basis, and to establish its efficacy to the medical world. We think such expenditures were capital in nature; and, since the benefits to be obtained from such research were neither limited to the ampules already produced, nor susceptible to measurement in terms of useful life, we reluctantly see no way in which to allow amortization of

---

[16] In our original opinion we set forth a tabulation of the ampules sold during the years 1954 through 1958. The total amounted to 130,262 ampules. 54 T.C. at 1395.

[17] Compare sec. 1.167(b)-0(a), Income Tax Regs., which provides:

"The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. * * *"

such expenditures for the years in question. See *Hart-Bartlett-Sturtevant G. Co. v. Commissioner,* 182 F. 2d 153 (C.A. 8, 1950), affirming 12 T.C. 760 (1949). [54 T.C. at 1395 n. 29.]

Petitioner has relied upon *Liberty Insurance Bank, supra,* to support a ratable amortization over the years in which the remaining 136,097 ampules were sold. However, in that case the Commissioner had *conceded* a 4-year useful life to promotional expenditures, allowing 25 percent of the costs thereof to be written off each year. The Court was never presented with the issue of whether there was any ascertainable useful life with respect to the expenditures. Rather, it only had to decide whether petitioner was entitled to a full current deduction or the 25-percent writeoff allowed by the Commissioner. Consequently, we do not feel constrained to hold the cost of the 63,903 ampules is amortizable over the years 1954 to 1958, and we decline to do so.

We do not deny that petitioner incurred a cost in distributing the 63,903 ampules free of charge. However, on the record before us we are unable to conclude that petitioner is entitled to amortize any portion of that cost.

*Decision will be entered under Rule 155.*