FRANK TERNOVSKY AND HELEN TERNOVSKY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8112-73.     Filed July 6, 1976.

Frank Ternovsky, pro se.
*Bill D. McDaniel,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1966 | $1,177.00 |
| 1967 | 770.26 |
| 1969 | 1,695.87 |

The issues presented for our determination are the amount paid in Hungary in 1949 for a stamp collection and the conversion of that amount into United States dollars. The claimed deduction which respondent disallowed relates to a casualty loss resulting from a theft of the stamp collection from petitioners' house.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Frank and Helen Ternovsky are husband and wife who resided in Los Angeles, Calif., during the years in

issue and at the time of the filing of their petition with this Court. For the taxable years 1966, 1967, and 1969 petitioners filed joint Federal income tax returns with the Internal Revenue Service Center, Ogden, Utah.

Frank Ternovsky (hereinafter petitioner) was a successful practicing attorney in Hungary following World War II and until he emigrated to the United States in 1956. The postwar economic and political situation in Hungary was in turmoil, and petitioner was concerned that the cash savings he had managed to accumulate would be confiscated by the Communist government. Accordingly, in September 1949 petitioner purchased a stamp collection for 280,000 forints[1] in an attempt to transform his cash savings into a more readily concealable medium.

The parties have stipulated that in September 1949 the official currency exchange rate between Hungarian forints and U.S. dollars was 11.74 forints per dollar. It is further stipulated that the black market rate fluctuated between 41 and 42 forints per dollar during the same period. Using the official rate of exchange petitioner paid the equivalent of approximately $23,850.10 for the stamp collection. Calculated at the black market rate, petitioner paid the equivalent of between approximately $6,829.27 and $6,666.67 for the collection. In 1956 petitioner emigrated to this country, bringing the stamp collection with him. He settled in California in 1957.

In 1967 petitioner purchased a casualty insurance policy on the stamp collection. In connection therewith a professional appraiser valued the collection at $38,575.64,[2] and the policy was issued in this amount. On May 13, 1968, petitioner's house was burglarized and the stamp collection and a coin collection were stolen. In 1969 petitioner received $18,379 from the insurance company in settlement of his $38,678[3] claim. Petitioners claimed a $22,289[4] casualty loss on their 1969 return creating a net operating loss carryback to the tax years 1966 and 1967.

[1] The forint is the Hungarian unit of currency.

[2] The parties stipulated that the appraised value was $35,575.64. The appraisal which was stipulated as an exhibit indicates the value was $38,575.64.

[3] This figure represents the total loss resulting from the theft of the stamp and coin collections based on petitioners' claimed fair market value at the time of the theft. The settlement figure was based on a clause in the insurance policy limiting recovery to a maximum of $100 per stamp.

[4] This figure represents a net loss of $20,299 not compensated for by insurance, plus $1,990 in legal fees incurred in litigation with the insurance company.

Respondent allowed petitioner tentative refunds for the tax years 1966 and 1967 due to the loss carryback.

Respondent subsequently disallowed the theft loss deduction in full, claiming that petitioner failed to establish that a loss was incurred or, alternatively, that the cost of the stamp collection exceeded the amount of the insurance recovery. The disallowance of the deduction resulted in deficiency assessments being made against petitioner for the year in which the loss was incurred and the years to which the loss was carried back.

### OPINION

Petitioner presents several arguments in support of his claimed theft loss deduction. He first maintains that section 165(c)(3),[5] the provision allowing a deduction for theft losses, cannot equitably be applied to naturalized citizens sustaining theft losses of appreciated property purchased prior to emigration. In the event we find that section 165 does apply, petitioner recognizes that it will be necessary to calculate the 1949 U.S. dollar equivalent of 280,000 Hungarian forints, the price petitioner paid for the stamp collection. Accordingly, petitioner argues that in the event the calculation must be made, a currency exchange rate based on the relative "buying power" characteristics of the two currencies should be used for the conversion. In the event we find this rate inapplicable, petitioner maintains that the official exchange rate should be employed in making the conversion.

It is respondent's position that the evidence is not sufficient to support a finding that petitioner paid 280,000 forints or any amount for the stamp collection, and he was, therefore, not entitled to claim any amount as a theft loss deduction. Respondent argues further that in the event we find petitioner did pay 280,000 forints for the stamps, this amount should be converted into U.S. dollars using the black market (commercial) rate of exchange.

Section 165(c)(3) allows an individual taxpayer to claim as a deduction any loss by theft sustained during the taxable year and not compensated for by insurance or otherwise. The loss shall be allowed only to the extent that the amount of the loss arising from each theft exceeds $100. The amount of the loss is the lesser of (1) the fair market value of the property immediately before

---

[5] All statutory references are to the Internal Revenue Code of 1954, as amended.

the loss or (2) the adjusted basis of the property. Secs. 1.165-7 and 1.165-8, Income Tax Regs. The basis of property for income tax purposes is the cost of such property. Sec. 1012.

Petitioner's preliminary argument is in essence a prayer for equitable relief from the application of a provision of the Internal Revenue Code. While we are convinced of petitioner's sincerity in this regard, we are required to hold that this Court does not have the jurisdiction of a court of equity. Equitable principles are not controlling in our determination of the proper application of Code provisions. *Commissioner v. Gooch Co.,* 320 U.S. 418 (1943). We are unable to provide the relief for which petitioner prays.

Respondent's preliminary argument is that petitioner failed to establish his basis in the stamp collection. We have disposed of this issue in the findings of fact wherein we determined that petitioner paid 280,000 Hungarian forints in 1949 for the stamp collection. Our finding was based on a careful review of the record and our favorable impression of petitioner's credibility as a witness. The principal issue left for our determination is the applicable rate of monetary exchange to be used in converting 280,000 Hungarian forints into U.S. dollars.

Although there was little evidence introduced at trial, three rates of exchange were presented. All purport to encompass the time of purchase of the stamps. The following table summarizes the results of converting 280,000 forints into dollars using the rates in evidence:

| Exchange rate (forints per dollar) | U.S. dollar equivalent |
|---|---|
| Official rate throughout 1949 (11.74) _____ | $23,850.10 |
| Black market rate as of 8/31/49 (41) _____ | 6,829.27 |
| Black market rate as of 9/31/49 (42) _____ | 6,666.67 |
| Buying power rate: [6] | |
| Bread (5.08) _____ | 55,118.11 |
| Potatoes (4.94) _____ | 56,680.16 |
| Milk (3.70) _____ | 75,675.68 |

Petitioner maintains that his basis in the stolen collection in U.S. dollars should be calculated using either his buying power or the official rate of exchange. Respondent argues that his use of the

---

[6] Petitioner arrived at these rates by direct comparison of 1950 U.S. average retail prices of three food items—bread, potatoes, and milk—(1949 statistics were apparently unavailable to petitioner) with the 1949 Hungarian average retail prices of the same three items. The resulting ratio petitioner identifies as a "buying power" rate of currency exchange.

black market exchange rate should be upheld. Should we adopt respondent's position, petitioner's insurance recovery was in excess of his basis and he must be found to have incurred no deductible theft loss in the taxable year 1969.

Many cases have considered the issue of applicable exchange rates to be applied in calculating the U.S. dollar value of foreign currency or assets. E.g., *Cinelli v. Commissioner,* 502 F.2d 695 (6th Cir. 1974), affg. a Memorandum Opinion of this Court. *Durovic v. Commissioner,* 487 F.2d 36 (7th Cir. 1973), revg. 54 T.C. 1364 (1970). *Marko Durovic,* Supplemental Opinion, 65 T.C. 480 (1975). The *Cinelli* case involved the calculation in U.S. dollars of a taxpayer's basis in an Italian villa for purposes of a casualty loss deduction. The property had been valued in lire. There, as here, the court had before it evidence of an official rate of exchange and a black market rate of exchange. The concern was to choose the rate which most accurately measured the actual purchase power equivalence of a foreign currency valued in terms of U.S. dollars. The court rejected the official rate as an accurate measure of purchasing power because that rate was:

based on governments' collateral motives—to expand or contract exports and imports, to encourage or discourage foreign investment, and to control the flow of foreign currency into and out of a country * * *. These purposes are divorced from considerations of actual purchasing power of a currency, which is the basic criterion for determining the U.S. dollar worth of property priced in a foreign currency. * * * [*Cinelli v. Commissioner, supra* at 698. Fn. ref. omitted.]

Rather, the black market rate was held to be the applicable rate of exchange. The black market exchange rate indicates the ratio at which currency of one country is unofficially being sold or exchanged for currency of another country on the open market. The court felt that this rate was at least a roughly accurate measure of the actual purchasing power of U.S. dollars in foreign currency.

The rationale underlying the choice made in *Cinelli* is applicable in this case as well. Our concern is to arrive at a figure which accurately measures in U.S. dollars the cost of property for which petitioner paid 280,000 Hungarian forints. We are convinced that the Hungarian official rate of exchange will not yield such an accurate measurement of purchase power equivalence. That rate was set by the Government and was probably calculated so as to protect the country's financial stability. Petitioner indicated that currency exchanges between this

country and Hungary were prohibited by the Hungarian Government. This means that the official rate does not reflect the actual marketplace worth of the Hungarian forint. For this reason official exchange rates have frequently been rejected by the courts as accurate measures of the real U.S. dollar value of foreign currencies. See *Cinelli v. Commissioner, supra* at 696, and the cases cited therein.

We likewise doubt the accuracy of petitioner's own calculations of a so-called "buying power" rate of exchange as a vehicle for calculating the actual purchase power equivalence of U.S. dollars in terms of Hungarian forints. We do note that petitioner's calculations bear a certain similarity to a thorough and complex study involving a direct comparison of product quantity and price statistics for several nations.[7] From the results of the study an index of the internal purchasing power of currencies was produced. Such an index was not calculated for Hungary.

In our judgment petitioner's calculations are deserving of little weight because he failed to take account of several important factors which influence the retail price of a product and which could account for the difference in the relative prices of the food items he surveyed. Among those factors are the differing availability of natural resources and required skilled manpower; differing abilities to efficiently produce; differing rates of demand; differing levels of taxation and subsidization; and differences in quality. We are hard pressed to find any meaning in a direct quantity and price comparison such as that undertaken by petitioner wherein the potential effect of the above-outlined variables has not even been considered.[8]

Since evidence was introduced as to black market rates, we are convinced that arm's-length dollar-forint exchange transactions did take place in 1949. Hence, we conclude that the black market gives a close approximation of the real marketplace purchasing power of dollars in Hungary at that time and that it is at this rate that an American in Hungary in 1949 would most likely exchange U.S. dollars for Hungarian forints in order to purchase goods with the currency of that country. It is, therefore, reasonable and appropriate to employ this rate in giving a U.S.

---

[7] See Gilbert & Kravis, An International Comparison of National Products and the Purchasing Power of Currencies (1954).

[8] The Gilbert & Kravis survey, n. 7 *supra,* considered several of these factors, and corrections were made to account for their influence.

dollar value to property purchased with Hungarian forints. We are convinced that the black market rate is a far more accurate measure of actual value than either the official or "buying power" rates which are urged upon us by petitioner. We, therefore, hold that respondent did not err when he used the black market rate to give a U.S. dollar value to property purchased with Hungarian forints. It follows that petitioner is not entitled to claim a theft loss deduction because the loss incurred was more than fully compensated for by insurance.

*Decision will be entered for the respondent.*