MILTON C. ERWIN and THEOMARIE O. ERWIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Erwin v. Commissioner
Docket No. 2980-76.
United States Tax Court
T.C. Memo 1978-10; 1978 Tax Ct. Memo LEXIS 508; 37 T.C.M. (CCH) 36; T.C.M. (RIA) 780010; January 9, 1978, Filed Milton C. Erwin and Theomarie O. Erwin, prose. Karl D. Zufelt, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1968, 1969, 1970, and 1971 in the amounts of $3,738.85, $4,393.53, $1,715.06, and $1,609.45, respectively. [1]
The issues for decision are: (1) Whether petitioners are entitled to a deduction in 1971 for a theft loss in the amount of $75,000, or any portion thereof, for an alleged theft *509 of secret formulas and manufacturing processes for the manufacture of transformer cores; and (2) whether the fair market value of petitioners' 1966 Volkswagen at the time it was stolen was in excess of $600. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Long Beach, California at the time of the filing of the petition in this case filed joint Federal income tax returns for the calendar years 1968, 1969, 1970, and 1971. Milton C. Erwin (hereinafter *510 referred to as petitioner) was employed by Carstedt Research, Inc. as its manager from 1954 until the latter part of 1970. Carstedt Research, Inc. was engaged in the manufacture of transformer cores for use in various types of electronic instruments and equipment. Petitioner owned no stock in Carstedt Research, Inc. The major stockholder of that corporation was Mr. Carstedt, who was the corporation's president. Beginning in 1954, when petitioner first became employed by Carstedt Research, Inc., he and Mr. Carstedt began research work on various improvements to the transformer cores manufactured by Carstedt Research, Inc. and on developing new transformer core designs and new manufacturing processes and techniques for transformer cores. This work was done primarily after petitioner's normal working hours at Carstedt Research, Inc. and was done in the facilities owned by Carstedt Research, Inc. Some of the materials used by petitioner and Mr. Carstedt in their research were materials belonging to Carstedt Research, Inc. and some materials were materials which petitioner purchased with his own funds. Petitioner and Mr. Carstedt continued their research work in developing transformer *511 core designs and manufacturing processes until the latter part of 1966 or the early part of 1967.Thereafter the processes developed by petitioner and Mr. Carstedt were all available for use and some were used by Carstedt Research, Inc. in its manufacturing processes. At some time undisclosed by the record, Mr. Carstedt sold petitioner a 50 percent interest in Carstedt Sales Corporation, a corporation which had previously been owned entirely by Mr. Carstedt. Mr. Carstedt retained the other 50 percent interest in that corporation. Carstedt Sales Corporation was to receive a 15 percent commission on the sale of the products developed by petitioner and Mr. Carstedt in their joint research effort, as well as a 15 percent commission on other products manufactured by Carstedt Research, Inc. which had been developed by Mr. Carstedt prior to 1954. The research work done by petitioner and Mr. Carstedt led to Carstedt Research, Inc. being able to produce high permeability cores which were used in the Stanford Linear Accelerator. In September 1970 a fire destroyed the facilities of Carstedt Research, Inc. Shortly after this fire, petitioner disclosed the manufacturing process for the *512 high permeability cores to the chief engineer of Pierson Electronics, an electronic manufacturer. This disclosure was made without charge to Pierson Electronics. Petitioner left the employ of Carstedt Research, Inc. about one month after the fire. The research work done by petitioner and Mr. Carstedt led to an improved process for gapped toroid cores. The gapped toroid process was initially invented by Mr. Carstedt. The sales of the gapped toroid cores constituted approximately 5 percent of the sales of Carstedt Sales Corporation. These gapped toroid cores were produced by firms other than Carstedt Research, Inc. prior to 1971. Other aspects of the research done by petitioner and Mr. Carstedt led to the development of a special undercoating, the use of which reduced the stress on the cores without degrading the electrical properties of the cores. For 1970 and several years prior thereto, cores utilizing this undercoating constituted approximately 10 percent of the sales of Carstedt Research, Inc. Other developments made by petitioner and Mr. Carstedt were of a lapping process using diamond rouge. This process had the advantage that the diamond particles would not lodge *513 between laminations of the cores. Petitioner and Mr. Carstedt also developed an etching solution which cut the etching time required on cores to approximately one-half of the time required by other processes in the manufacture of three-phase cores. They also developed a process of manufacturing gapped cores which reduced the electrical noise of such cores. Petitioner kept notebooks of his research work with Mr. Carstedt at Carstedt Research, Inc. At some time undisclosed by the record petitioner and Mr. Carstedt decided that they would like proof of their developments so that if someone applied for a patent in the same area they would be able to prove their prior invention.Therefore, petitioner typed off the various processes he and Mr. Carstedt had developed and placed a copy of each of these processes in an envelope addressed to him and similar copies in an envelope addressed to Mr. Carstedt. The envelopes were sealed. The envelope addressed to petitioner was sent to him by registered mail and the envelope addressed to Mr. Carstedt was sent to him by registered mail. In December 1970 petitioner became employed by Magnetic Metals, Inc. for the purpose of setting up a transformer *514 core manufacturing facility in Newport Beach, California. As part of petitioner's agreement with Magnetic Metals, Inc. he was to receive a bonus of a percentage of the income derived by the company from the manufacture and sale of cores. On December 30, 1971, petitioner lent his Volkswagen to his son. At the time petitioner lent the car to his son his briefcase was in the front compartment of the Volkswagen. Petitioner had placed the briefcase in the car, planning to take it with him to his work after the holidays, and forgot about the briefcase being there when he lent the car to his son. In petitioner's briefcase were several loose papers of various kinds, as well as the registered envelope which had previously been mailed to petitioner with the seal on the envelope still unbroken. On December 30, 1971, petitioner's 1966 Volkswagen, with the briefcase containing the sealed envelope and other papers of petitioner, was stolen. Petitioner did not report the theft to the Long Beach Police Department until January 5, 1972. When petitioner made the report he did not mention that the briefcase containing the documents was in the Volkswagen. Petitioner reported the car to the police *515 as having a value of $600 on December 30, 1971. In April 1972 petitioner's automobile, together with his briefcase, was recovered by the police undamaged in Seal Beach, California. However, when the automobile and briefcase were recovered the briefcase did not contain the sealed envelope. Petitioners, on their Federal income tax return for the calendar year 1971, claimed a casualty loss of $75,980.30, which they computed as follows: Theft of car
$ 1,080.30
Theft of manufacturing
processes
75,000.00
Less Exclusion
100.00
Total
$75,980.30
On January 8, 1973, petitioners filed an application for tentative refund for carryback of net operating loss, claiming refunds of $3,739, $4,394, and $1,715 for the years 1968, 1969, and 1970, respectively. Refunds were tentatively allowed by respondent. Respondent, in his notice of deficiency, disallowed petitioners' deduction for the claimed theft loss with the following explanation: The deduction of $75,980.30 you claimed as a theft loss, $75,000 for "core manufacturing processes and formulas" and $1,080.30 for an automobile, less the $100 statutory reduction, is not allowable because you have not established *516 that any deductible loss was sustained during the tax year or that you had legal title to the manufacturing processes and formulas. The loss due to the theft of the automobile is not allowed because the automobile was recovered without loss of value. Respondent further determined that petitioner did not sustain a net operating loss in the taxable year 1971 because of the theft loss not being allowable and, therefore, there was no net operating loss carryback to prior years as claimed in the application for tentative refunds. OPINION Section 165, I.R.C. 1954, [3] provides for an allowance of a deduction for any loss sustained during the taxable year not compensated for by insurance or otherwise. Among such deductible losses are losses from theft. Also, under the provision of subsection (c)(3) of section 165, if a loss arises from theft such a loss in excess of $100 may be deducted even though not connected with a taxpayer's trade or business. In the *517 instant case the evidence is very sparse concerning the loss of petitioner's Volkswagen. Apparently respondent's initial disallowance of the loss deduction was on the basis that the theft of the car and its recovery were both in 1972. At the trial it became clear that the theft occurred on December 30, 1971, and, though the evidence is not completely clear on the subject, apparently the theft of petitioner's Volkswagen was disclovered in 1971. We have therefore interpreted respondent's brief as conceding that petitioner was entitled to a theft loss in connection with his Volkswagen in 1971 of $500 (the $600 value of the Volkswagen less the $100 reduction) and petitioner as conceding that this amount must be included in his income in 1972 when the Volkswagen was recovered if it is allowed as a deduction in 1971. The evidence shows that petitioner reported the Volkswagen as having a value of $600 in his report to the police. Petitioner at the trial testified to the $600 value of the Volkswagen. On brief, petitioner argues on the basis of some facts not placed in the record for a higher value for the Volkswagen. However, we are limited by the record and conclude that the proper *518 valuation for the Volkswagen is $600. Although the evidence is marginal, it does appear that at the end of 1971 there was little prospect of petitioner's recovery of the Volkswagen, which in fact was recovered in 1972, and that petitioner was not otherwise compensated for his loss. The loss in 1971 must be determined by the prospect of compensation for or reacquisition of the property as of the close of that year. See Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974). The real argument between the parties centers on petitioner's claimed loss by theft of certain secret formulas. Respondent takes the position that petitioner has failed to show that the secret documents relating to the design and manufacture of transformer cores were in fact stolen from petitioner. Respondent further contends that petitioner has failed to show that he had any proprietary interest in the secret formulas which he alleges were stolen or that he had any basis in these formulas. While respondent does not specifically contend that petitioner has failed to show any fair market value of the secret formulas and processes he claims to have been stolen, some of his argument is *519 directed to the lack of evidence in this respect. Certainly at the trial the Court specifically directed petitioner's attention to the fact that it would be incumbent on petitioner to establish the fair market value of the processes which he alleges were stolen. We have considered carefully all of the testimony and evidence offered by petitioner. Much of the testimony is confusing. For example, petitioner in effect testified that the most valuable of the processes which he alleges were stolen was the process for the manufacture of high permeability cores of the type which Carstedt Research, Inc. had manufactured for the Stanford Linear Accelerator. Petitioner went into some detail about the value of this process. However, he later testified that prior to 1971 he had disclosed this process to the chief engineer of Pierson Electronics without compensation. Petitioner testified that this was done after the Carstedt Research plant was destroyed by fire. In this respect petitioner testified: I gave him the heat treat. I let him copy off notes on the heat treat process to develop those permeabilities so that he was able to make them in his own shop. What petitioner permitted *520 to be copied is not clear from the record. He testified that his notebooks were destroyed in the fire at the Carstedt Research plant and that the envelope, with the seal unbroken, sent to him by registered mail containing documents describing the manufacturing processes had been in the car when the car was stolen. There is nothing in this record to explain where petitioner obtained the notes that he permitted the chief engineer of Pierson Electronics to "copy off" if his notebooks were destroyed in the fire and the copies in the sealed envelope were the only other copies available to petitioner. Without going into detail, this record is totally unclear that there was any fair market value in the papers which were in the sealed envelope which was stolen when petitioner's car was stolen. In addition to the process which had been given by petitioner to another company, apparently information on another process had been obtained by a competitor of Carstedt Research, Inc. when an employee of the competitor had gone through the Carstedt Research plant prior to the fire. Other processes had not been used by Carstedt Research in its manufacture even though Carstedt Research, Inc. had *521 available all the processes developed by petitioner and Mr. Carstedt in their research since at least 1966. If such a process had commercial value, it would appear that the process would have been used by Carstedt Research, Inc. at some time during a period of at least 5 years. Petitioner stresses his loss of the sealed envelope containing documents. However, it is the secret process itself rather than any specific document outlining such process which constitutes a "property" interest. See E.I. duPont DeNemours and Co. v. United States,288 F.2d 904, 910-11 (Ct. Cls. 1961). There is nothing in this record to show the fair market value, if any, of the documents stolen from petitioner's car. To the extent petitioner had other sources, such as reacquiring the process disclosed to the chief engineer of Pierson Electronics from that company, there obviously was no fair market value to the papers stolen. It has long been settled that the amount of a casualty or theft loss which is *522 deductible is the fair market value of the property lost limited by the taxpayer's adjusted basis in that property. See Helvering v. Owens,305 U.S. 468 (1939); Ternovsky v. Commissioner,66 T.C. 695, 697-698 (1976). While, as respondent argues, the evidence in this case as to petitioner's basis in the secret formulas is weak, we would attempt to determine that basis from the sparse evidence available in the record if petitioner had in fact shown any fair market value to the documents lost when his Volkswagen was stolen. Obviously, as respondent contends, the value of petitioner's own labor does not form a part of the basis of the secret formulas. However, the record does show that petitioner expended some funds for material in connection with the various research projects he did with Mr. Carstedt. It is true, as respondent points out, that these expenditures have not been directly connected with the processes which petitioner alleges were stolen. However, there is some indication in the record that a part of such funds may have been connected with such projects. Since petitioner has failed to show what, if any, fair market value the stolen *523 documents had, we do not reach the question of petitioner's basis, if any, in the secret processes, some of which apparently were written out in the documents stolen. We also agree with respondent that the implication from the record is that petitioner and Mr. Carstedt had transferred the proprietary rights in the processes they developed either to Carstedt Research, Inc. or Carstedt Sales Corporation which was owned equally by them. The record is not clear that the 15 percent of sales paid by Carstedt Research, Inc. to Carstedt Sales Corporation was because the latter corporation had a proprietary interest in the processes developed by petitioner and Mr. Carstedt. However, there are indications in the record that this may be the fact. It is also unclear from the record as to the understanding between petitioner, Mr. Carstedt and Carstedt Research, Inc. with respect to the right of Carstedt Research, Inc. to use the processes developed by petitioner and Mr. Carstedt. If the proprietary rights in the processes were owned by either Carstedt Sales Corporation or Carstedt Research, Inc., petitioner would not be entitled to a loss deduction for loss of the processes, even if such *524 a loss occurred. See Rink v. Commissioner,51 T.C. 746, 753 (1969). As above pointed out, petitioner has failed to show how the loss of the papers contained in the sealed envelope caused the loss of the secret processes described in those papers. It would appear that petitioner could have obtained from Pierson Electronics the information on the process he previously disclosed to that company's chief engineer. Also, it is not clear that petitioner did not have other sources of information as to the processes. Petitioner testified that his notebooks were destroyed in the fire at Carstedt Research, Inc. and that Mr. Carstedt had died in about June of 1971 so that he could not obtain copies of his lost documents from Mr. Carstedt. Petitioner also testified that the registered envelope in which his papers were contained was still sealed when the car was stolen.However, as above pointed out, petitioner testified to permitting the chief engineer of Pierson Electronics to copy notes after the fire at Carstedt Research, Inc. In any event, this record is totally inadequate to show that secret processes in which petitioner had a proprietary interest were stolen from *525 petitioner in 1971 or any fair market value of the documents which were stolen. Except to the extent of the $600 value of the Volkswagen, which we understand respondent to now concede constituted a theft loss to petitioners in 1971, we sustain respondent's disallowance of petitioners' claimed theft loss in 1971. Decision will be entered under Rule 155. Footnotes
1. The deficiencies for the years 1968, 1969, and 1970 resulted from the disallowance of carryback losses from the year 1971 which had been previously tentatively allowed. The only adjustment to petitioners' taxable income is the adjustment made by respondent in 1971.↩
2. In the deficiency notice respondent disallowed petitioners' total claimed deduction of $1,080 for the theft of their Volkswagen in 1971, assigning as basis therefore that "the loss due to the theft of the automobile is not allowed because the automobile was recovered without loss of value." At the trial respondent effectively conceded that if the theft occurred in 1971 petitioners would be entitled to a deduction of $600 less the $100 deductible amount for the theft of the Volkswagen, since the Volkswagen was not recovered until April 1972. Petitioners conceded that any loss allowed for the Volkswagen in 1971 would constitute income in 1972.↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩