COCHRAN HATCHERY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cochran Hatchery, Inc. v. Commissioner
Docket No. 9845-75.
United States Tax Court
T.C. Memo 1979-390; 1979 Tax Ct. Memo LEXIS 127; 39 T.C.M. (CCH) 210; T.C.M. (RIA) 79390; September 24, 1979, Filed Edwin T. Robinson, for the petitioner. Vernon J. Owens, for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes for the years 1970 through 1972: Year
Deficiency
1970
$53,780
1971
45,275
1972
15,728
The sole issue for our *128 determination is whether respondent abused his discretion by retroactively revoking permission for petitioner to change from the accrual method of accounting to the cash receipts and disbursements method. This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by reference. Cochran Hatchery, Inc. (hereinafter Cochran or petitioner) is an Indiana corporation which had its principal place of business at Portland, Indiana, at the time of the filing of its petition. Petitioner timely filed Federal income tax returns for the years 1970 and 1971 with the District Director of the Internal Revenue Service in Cincinnati, Ohio and for the year 1972 with the Internal Revenue Service Center in Memphis, Tennessee. At all times pertinent, Cochran was engaged in the business of farming. Its operations consist of purchasing baby pullet chicks, marketing their eggs for food purposes from the time the chicks are between twnety to twenty-six weeks old, hatching the eggs after the chicks are twenty-six weeks old, destroying the new males, or cockerels, and selling the new females, *129 or pullets, either directly to commercial egg producers or to a starter pullet facility which raises them to twenty weeks when they are then sold to commercial egg producers. After approximately one year of egg production, petitioner must replace its breeder flock. Since 1968, the shareholders of Cochran were: Vere F. Cochran (95.9 percent), Mary Cochran, Vere's wife (.1 percent), and John N. Howell (4.0 percent). From 1968 through 1972, the corporate officers of Cochran included Vere F. Cochran as president-treasurer, John N. Howell as vice-president, and Mary F. Cochran as secretary. Petitioner used the accrual method of accounting from the time of its initial business activity in 1965 through December 31, 1969. On or about February 23, 1970 petitioner submitted to the Internal Revenue Service Form 3115 requesting a change to the cash method of accounting, on the basis that it "will more clearly reflect taxable income in conformance with other taxpayers in the hatchery business." In a letter dated September 25, 1970 petitioner's request was denied for the stated reason that its present accounting method more clearly reflected income. A conference was held on October 9, 1970 to *130 allow petitioner to present additional information. A memorandum from that conference, prepared by Roger H. Epstein (hereinafter Epstein) for respondent, indicates that petitioner's application was specifically denied because of respondent's policy of concluding that a farmer with inventories in excess of $75,000, like petitioner, was properly on the accrual method. At this conference, respondent agreed to reconsider Cochran's application. Petitioner's representative Thomas Parsons (hereinafter Parsons) supplied additional information to respondent in a letter dated October 23, 1970 and in a telephone conversation on November 3, 1970. In his letter, Parsons asserted, as the first and second reasons necessitating the accounting method change, that petitioner had large and increasing accounts receivable and that starter pullet facilities which purchased its chicks had difficulty paying petitioner until the chicks were later sold to commercial egg producers. The other points made by Parsons included the initial eror of adopting the accrual method caused by inexperience and poor advice, petitioner's bookkeeper's knowledge of only the cash method and the concomitant cost and time involved *131 in year-end conversions from the cash to the accrual method. In the telephone conversation, Parsons gave respondent data showing that petitioner had steadily increasing accounts receivable for the years 1966 through 1970. In a letter dated January 28, 1971, Cochran was granted permission to change its accounting method effective beginning the taxable year ended December 31, 1970, subject to seven conditions, all of which have been fulfilled. In a memorandum prepared by Epstein, dated November 4, 1970, there are notes to the effect that a major factor in respondent's decision to reconsider and ultimately to grant petitioner a change in accounting methods was Cochran's large accounts receivable (the "long delays in the collection of his accounts receivable" and the accrual method's being "extremely disadvantageous to the taxpayer especially in light of consistently increasing accounts receivable"). Epstein had concluded, from the new information presented by petitioner, that neither the accrual nor the cash method more properly reflected petitioner's income. In a letter dated April 17, 1974, respondent revoked his permission for petitioner's change from the accrual to the cash *132 method of accounting. The revocation was based on information respondent discovered during a field audit of Cochran conducted sometime during the taxable year 1973. Only then did respondent learn about the interrelationship between Cochran and Pullets Unlimited, Inc. (hereinafter Pullets), a starter pullet facility whose purchases represented substantially all of Cochran's accounts receivable for the years 1966 until Pullets' dissolution. [1]
Pullets, an Ohio corporation formed in 1966, had its principal business office, wherein its books and records were kept, at the same address as petitioner's. During the taxable years 196l through 1977, Pullets used the accrual method of accounting. Vere F. Cochran had substantial stock holdings in Pullets from the time of its incorporation. [2] In addition, at the time petitioner filed its Form 3115, Vere F. Cochran was Pullets' secretary-treasurer and John Howell, its vice-president; both men were members of its board *133 of directors. At this time, also, Mr. and Mrs. Cochran were guarantors of various outstanding indebtedness of Pullets. [3]
*134 From 1966 through 1969, Cochran's sales to Pullets, as a percentage of its total sales, [4] were as follows: Percentage of
Year
Sales to Pullets
1966
29.2
1967
49.3
1968
31.1
1969
43.9
For those years, the total amount due from Pullets, shown as a percentage of Cochran's total accounts receivable, was as follows: Percentage of Accounts
Year
Receivable due from Pullets
1966
95.8
1967
95.1
1968
100.0
1969
92.5
Petitioner has presented no evidence that it extended such favorable credit terms to any purchaser besides Pullets, that other growing houses customarily allowed delayed payments until the chicks could later be sold to commercial egg producers, or that its dealings with Pullets were in other respects at arm's length. By contrast, there is evidence that whenever a large bank balance appeared in Pullets' accounts, the funds were not used to reduce significantly Cochran's accounts receivable. Petitioner contends that it has fully complied with the *135 established administrative procedures for a change in accounting methods, that respondent's revocation constitutes an abuse of his discretion, that equity requires that respondent's revocation not be given retroactive effect, and that respondent has no authority to revoke his grant of consent. Respondent, on the other hand, asserts that petitioner's Form 3115 and the supplemental materials submitted in conjunction with that application did not contain a full and accurate statement of the material facts, that because of the interrelationship between Cochran and Pullets the possibility of a distortion of income existed and that, therefore, the retroactive revocation of petitioner's prior favorable ruling is proper. We agree with respondent.
Respondent clearly has statutory authority to revoke a ruling retroactively. Sec. 7805(b); [5]sec. 301.7805-1(b), Proced. & Admin. Regs. [6] That revocation, moreover, may not be disturbed unless the Commissioner has abused his discretion. In making this determination, we are precluded from merely requiring petitioner to carry the usual burden of proof *136 by a preponderance of the evidence and from substituting our own judgment for respondent's. Automobile Club v. Commissioner,353 U.S. 180 (1957); Pulver Roofing Co. v. Commissioner,70 T.C. 1001 (1978); Lowry Hospital Association v. Commissioner,66 T.C. 850 (1976). *137 A taxpayer filing his first return may adopt any permissible method of accounting for the taxable year covered by the first return. Sec. 1.446-1(e)(1), Income Tax Regs. In order to change accounting methods, however, a taxpayer is required to secure respondent's consent. Sec. 446(e); sec. 1.446-1(e)(2)(i), Income Tax Regs. It is well settled, moreover, that respondent has broad discretion to grant or refuse a change in accounting methods. Brown v. Helvering,291 U.S. 193 (1934); Barber v. Commissioner,64 T.C. 314 (1975). Petitioner chose the accrual method of accounting in its first return. It is immaterial to the issue of an accounting method change that petitioner could have originally adopted the cash method. The cases cited by petitioner, like Rocco, Inc. v. Commissioner,72 T.C. 140 (1979), and Gold-Pak Meat Co. v. Commissioner,522 F.2d 1055 (9th Cir. 1975), but see Peterson Produce Co. v. United States,313 F.2d 609 (8th Cir. 1963), that *138 deal with a taxpayer's first election of an accounting method have no bearing on the issue presented here. The fact is that petitioner did not initially select the cash method of accounting; in order to change to that method, it needed respondent's permission. As long as respondent has not abused his broad discretion, no distinction can be drawn, as petitioner suggests, between the propriety of respondent's conduct being correct as a matter of law, or being correct based upon what he deems to be the wise administration of the taxing statutes.
A retroactive revocation is not an abuse of discretion where respondent had not been apprised of all the material facts before he issued his ruling. Lowry Hospital Association v. Commissioner,supra;Harwood Associates, Inc., 6o T.C. 255 (1974); Colombo Club, Inc. v. Commissioner,54 T.C. 100 (1970). Moreover, respondent specifically excepts from his general policy against retroactive applications situations in which there has been a misstatement or omission of material facts. Statement of Procedural *139 Rules, 26 C.F.R. sec. 601.20-1(l )(5) (1978); [7]Rev. Proc. 67-1, sec. 13.05, 1967-1 C.B. 544, 553. Facts about the interrelationship between Cochran and Pullets were material to respondent's determination of whether a change in accounting methods could effect a distortion of petitioner's income. Cochran has not produced any evidence to show that other creditors were accorded the preferential treatment given Pullets or that other growing houses customarily permit a delay in payment until the chicks are grown to laying age. There is evidence, however, that Pullets did not apply its funds to reduce significantly its accounts *140 payable to Cochran. Petitioner emphasized its large and increasing accounts receivable in order to influence respondent to reconsider and grant its request for an accounting method change that was initially rejected by him. We find that petitioner's accounts receivable were indeed the significant factor that motivated respondent's change of mind. Yet, petitioner failed to inform respondent of its inerrelationship with Pullets or even that substantially all of its accounts receivable were from one grower. petitioner cntends that it fully complied with the requirements of section 1.446-1(e)(3)(i), Income Tax Regs., [8] which delineates the procedure for obtaining respondent's consent for a change in accounting method. Petitioner asserts it timely filed an application on Form 3115, furnished all information requested on the form, and in its correspondence, telephone discussions, and conferences supplied whatever additional information respondent requested. Essentially, petitioner expresses its predicament of being unable to anticipate "the group of corporations *141 factor which the Respondent would later deem material." *142 We think it unlikely that petitioner was in such a quandary. Petitioner knew, for example, that it was emphasizing its large accounts receivable in its letter of October 23, 1970 and its telephone conversation of November 3, 1970. Certainly, petitioner knew that respondent was concerned with the possibility of a distortion of its income that could result from its accounting method change; it stated on Form 3115 that its purpose in requesting the change in accounting methods was to reflect more clearly its taxable income. To underline its accounts receivable without identifying the connection between Cochran and Pullets, therefore, amounted to depriving respondent knowledge of material information. It would be exceedingly difficult, if not impossible, for respondent to design specific questions covering every conceivable circumstance relating to an accounting method change. Because of this problem, the rules require a verification of petitioner's representations to ensure that they reflect an accurate statement of the material facts. Statement of Procedural Rules, 26 C.F.R. sec. 601.204(c) *143 . [9] That respondent never directly asked petitioner about any interrelationship between itself and the company or companies with which it had accounts receivable, does not preclude the omission of that interrelationship's being characterized as an omission of a material fact. Petitioner relies on Lesavoy Foundation v. Commissioner,238 F.2d 589 (3d Cir. 1956), for the principle that a completed form of respondent's choosing is equivalent to the disclosure of all material facts. The taxpayer in Lesavoy, *144 however, through its answers and a balance sheet attached to the return did at least provide sufficient information from which the Commissioner could have pieced together that a change in the taxpayer's activities had occurred. Here, even were we to require that respondent be adept at jigsaw puzzles, he could not have arrived at a complete picture of petitioner's accounts receivable with the information provided on its application. Moreover, as we distinguished Lesavoy in Colombo Club, Inc. v. Commissioner,supra,Lesavoy dealt with a change in an organization's operations subsequent to its exemption ruling. We are here dealing with a situation in which respondent contends that, at the time he issued his ruling, he was not fully informed about all the material facts. Similarly, in Lansons, Inc. v. Commissioner,69 T.C. 773 (1978), on appeal (5th Cir., Aug. 28, 1978, by respondent, and Sept. 29, 1978, by petitioner), another case on which petitioner relies, we found no misstatement or omission of material facts. Petitioner maintains, in addition, that equity requires that the respondent's revocation not be given retroactive *145 effect. We understand petitioner's argument not to imply that we have equity jurisdiction since it is well settled that we do not, commissioner v. Gooch Co.,320 U.S. 418 (1943); Hays Corp. v. Commissioner,40 T.C. 436 (1963), affd. 331 F.2d 422 (7th Cir.), cert. denied 379 U.S. 842 (1964); Ternovsky v. Commissioner,66 T.C. 695 (1976), but to assert that respondent abused his discretion by not treating petitioner equally with its competitors or by not indicating to applicants like petitioner what information it was supposed to reveal. Petitioner relies on International Business Machines Corp. v. United States,170 Ct. Cl. 357, 343 F.2d 914 (1965), cert. denied 382 U.S. 1028 (1966), to support its first point and on Central Illinois Public Serv. Co. v. United States,435 U.S. 21 (1978) and Crown v. Commissioner,585 F.2d 234 (7th Cir. 1978), for its second. Petitioner's arguments are untenable as applied to its situation. In IBM, the Commissioner unduly favored taxpayer's competitor by revoking only prospectively its *146 ruling while retroactively revoking IBM's ruling on an almost identical computer. This disparate treatment caused IBM's competitor to receive favorable tax treatment for two and one-half years. Unlike in IBM, however, there is no evidence here that respondent ever gave a competitor preferential treatment. In fact, since respondent had a policy of summarily concluding that a farmer with inventories greater than $75,000 was correctly on the accrual method, it seems more probable that competitors in precisely petitioner's situation were denied an accounting change to the cash method.That many of petitioner's competitors initially adopted the cash method of accounting is immaterial since petitioner also originally had that option. Central Illinois Public Serv. Co., moreover, involved the lack of a government ruling or regulation to indicate to the taxpayer that he had a withholding obligation. Similarly, Crown referred to the absence of any authority to suggest that interest-free demand loans effected a taxable gift. Under section 1.446-1(e)(3)(i), Income Tax Regs. *147 , however, it is clear that petitioner had a duty to reveal all material factors pertinent to its request for an accounting method change, that it had to "[disclose] in detail all classes of items which would be treated differently under the new method of accounting." The rules, moreover, explain that permission to change accounting methods is subject to verification that an applicant's representations "reflect an accurate statement of the material facts." Sec. 601.204(c), Statement of Procedural Rules. It cannot be said that petitioner lacked guidance from respondent about its duty to reveal its connection with Pullets. Petitioner's argument that there is no potential for abuse since farmers may initially adopt the cash method of accounting misses the point. The potential for abuse here is rather in encouraging taxpayers to present incomplete information about material facts on the excuse that respondent did not pointedly ask about it. Petitioner's final argument also lacks merit. It contends that since the granting of consent to change an accounting method is neither a ruling nor a regulation, respondent lacks the power under section 7805(b) retroactively to revoke his consent *148 to petitioner. However, the rules in effect at the time petitioner filed his Form 3115 expressly provided, and still provide: Written permission to a taxpayer by the National Office consenting to a change in his annual accounting period or to a change in his accounting method is a "ruling". * * * Sec. 601.204(c), Statement of Procedural Rules. Decision will be entered for the respondent.
Footnotes
1. Pullets was dissolved on November 2, 1977. On its 1977 Federal income tax return, Cochran claimed a bad debt deduction for $185,281, representing its net uncollected account receivable for chicks sold to Pullets.↩
2. From 1966 until December 12, 1968, Vere Cochran, Herbert Meiring, and Werner Staugler each owned one-third interests in Pullets. Werner Staugler's shares were then redeemed by the corporation on December 12, 1968 and from January 3, 1969 until March 28, 1970, Pullets was owned by Vere Cochran (49.67 percent), Herbert Meiring (49.67 percent), and John N. Howell (.66 percent). From March 28, 1970 until February 28, 1972 Pullets was owned by Vere Cochran (48.8 percent), Herbert Meiring (48.8 percent), and John N. Howell (2.4 percent). On February 28, 1972 Pullets redeemed John N. Howell's stock so that for the rest of the taxable year 1972 until January 8, 1973, the remaining shareholders each owned 50 percent of Pullets' stock. In addition to having substantial holdings in Pullets, Vere Cochran was one-third owner of Mississinawa Poultry, Inc. (hereinafter Mississinawa) from its incorporation on November 30, 1970 through December 31, 1972. Herbert Meiring and John D. Weaver equally held the remaining interests in Mississinawa. These men were also general partners in an Ohio limited partnership known as Agri Production Group (hereinafter Agri), a commercial egg producer.Mississinawa, which was organized to provide a portion of financing for Agri, took over the egg production business on March 18, 1972 when Agri was unable to raise an adequate amount of capital. In its operation of the egg production business Mississinawa would purchase 20-week-old pullets from Pullets. In the fiscal year ended March 31, 1973, such purchases amounted to $346,795 of which $226,190 represented the amount due from Mississinawa to Pullets. ↩
3. Most of the obligations of Cochran, Pullets and Mississinawa were individually guaranteed by the various shareholders in order to secure credit for the corporations. When guarantees were given, each significant shareholder would participate; i.e., Vere Cochran and his wife would guarantee the debts of Cochran; they would be joined by Mr. and Mrs. Meiring on the Pullets obligations; and by the Meirings and Mr. and Mrs. Weaver on the Mississinawa obligations. Additionally, Mr. and Mrs. Cochran were liable on the mortgates with respect to the real estate owned personally by them and leased to Cochran. Respondent asserts that he was not informed of the financial risk assumed by Mr. and Mrs. Cochran. This omission of what he considers a material fact is part of respondent's broader complaint that he was not told about the interrelationship between Cochran and Pullets.↩
4. Based on the total sales of Cochran as reported, using the accrual method, on its corporate Federal income tax returns, Form 1120, for the years 1966 through 1969.↩
5. All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue. Section 7805(b) provides: The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect. ↩
6. Section 301.7805-1(b), Proced. & Admin. Regs., provides in part: The Commissioner may prescribe the extent, if any, to which any ruling relating to the internal revenue laws, issued by or pursuant to authorization from him, shall be applied without retroactive effect.↩
7. Section 601.201(l )(5), Statement of Procedural Rules, provides in part: Except in rare or unusual circumstances, the revocation or modification of a ruling will not be applied retroactively with respect to the taxpayer to whom the ruling was originally issued or to a taxpayer whose tax liability was directly involved in such ruling if (i) there has been no misstatement or omission of material facts, * * *.↩
8. Section 1.446-1(e)(3)(i), Income Tax Regs., provides: Except as otherwise provided under the authority of subdivision (ii) of this subparagraph, in order to secure the Commissioner's consent to a change of a taxpayer's method of accounting, the taxpayer must file an application on Form 3115 with the Commissioner of Internal Revenue, Washington, D.C. 20224, within 180 days after the beginning of the taxable year in which it is desired to make the change. The taxpayer shall, to the extent applicable, furnish (a) all information requested on such form, disclosing in detail all classes of items which would be treated differently under the new method of accounting and showing all amounts which would be duplicated or omitted as a result of the proposed change and (b) the taxpayer's computation of the adjustments to take into account such duplications or omissions. The Commissioner may require such other information as may be necessary in order to determine whether the proposed change will be permitted. Permission to change a taxpayer's method of accounting will not be granted unless the taxpayer and the Commissioner agree to the terms, conditions, and adjustments under which the change will be effected.See section 481↩ and the regulations thereunder, relating to certain adjustments required by such changes * * *.
9. Section 601.204(c), Statement of Procedural Rules, provides in part: in the examination of returns involving changes of annual accounting periods and methods of accounting, district directors must determine whether the representations upon which the permission was granted reflect an accurate statement of the material facts, and whether the agreed terms, conditions, and adjustments have been substantially carried out as proposed. An application, Form 3115, filed with the Director of the Internal Revenue Service Center is also subject to similar verification.↩